## THE STATE v. AUSTIN FRANCIS, Appellant.

### Division Two, December 4, 1906.

1. **CIRCUMSTANTIAL EVIDENCE: Sufficiency.** Where the evidence of the State is entirely circumstantial, in order to justify a verdict of guilty the facts and circumstances should be consistent with each other and with the guilt of defendant and inconsistent with any reasonable theory of his innocence. And tested by this rule, the verdict in this case cannot stand.

2. ———: ———: **Murder: Criminal Agency of Defendant: Poison.** Where the charge is that deceased came to her death as the result of poison administered to her by defendant, it is not only essential that the crime itself be proved, that is, that deceased came to her death as the result of poison administered, but that her death was the direct result of the criminal agency of defendant. And the death of deceased being undisputed, circumstantial evidence is sufficient to establish defendant's guilty agency therein if it is of such a character as to leave the inference of defendant's guilt the only reasonable inference to be deduced from the facts disclosed at the trial. But even though the jury may be authorized to find from the evidence that the cause of deceased's death was carbolic acid poison, yet to justify a verdict of guilty against defendant the evidence must point with conclusive force to that result and that defendant administered the poison to her.

3. ———: **Murder: Pregnancy of Deceased.** ˙Evidence tending strongly to show that defendant was responsible for the pregnancy of deceased, falls far short of˙establishing the fact˙ that he was her murderer, although it is clear that her death was caused by carbolic acid which she swallowed.

4. **MOTIVE.** It does not follow that there was no motive because none was made apparent, nor is the absence of any apparent motive conclusive of defendant's innocence, but it is a very important factor as tending to show his innocence.

5. ———: **Evidence of Motive.** The evidence tended strongly to show· that defendant had maintained illicit relations with deceased, a girl fifteen years old, who at the time of her death had been two months pregnant, and that he had a few times at least met her after dark at the bridge ·where her dead body was found, in˙ her ˙hand the cup which she had taken from her nearby home the night before, her death being due to carbolic acid swallowed. But there was no evidence that he had ever obtained for her or furnished her the poison which caused her death, or that she or he knew that she was pregnant, but on the other hand the evidence tended to show that she thought she had taken cold which had caused her monthly periods to cease, and that she was taking some simple patent medicine to restore her normal condition. They had no quarrel, but seemed to be˙ on the very best of terms. There was no evidence that he desired to break off his relations with her; on the contrary, it clearly shows that he desired their continuance. *Held,* that there was no apparent motive shown why he should have murdered her.

6. **ALIBI: Impeached Witness.** Where it is conclusively established that a witness who swore that he saw defendant the night of the alleged homicide· at the bridge where her dead body was found next morning, was not himself there, and that he either was mistaken as to the date or committed wilful perjury, his testimony is, in legal contemplation, the same as no testimony at all; and cannot be considered as substantial evidence tending to show defendant's guilt.

7. **MURDER: Conjecture and Suspicion.** Where at most the evidence adduced only raises a suspicion of guilt against the defendant, no verdict of guilty can be permitted to stand.

8. ———: ———: **Debauching Deceased.** Proof that defendant debauched deceased is not proof that he afterwards murdered her.

9. ———: **Character of Proof.** Circumstantial evidence must always be scanned with great caution and can never justify a verdict of guilty, especially of murder in the first degree, unless

the circumstances in proof are of such a character and tendency as to produce upon a fair and unprejudiced mind a moral conviction of the guilt of the accused beyond all reasonable doubt, and be absolutely inconsistent with his innocence.

Appeal from Jackson Criminal Court.—*Hon. Jno. W. Wofford,* Judge.

REVERSED.

*Hairgrove & Stubbs, Willis H. Leavitt* and *Oliver L. Wroughton* for appellant.

(1) The information is not sufficient to charge murder in the first degree by poisoning because: (a) It does not charge that defendant intended or contrived to kill deceased. (b) It does not charge that deceased did not take the poison voluntarily and with suicidal intent. (c) It does not negative the fact that the poison was administered to deceased in aid of self destruction. (d) It does not charge that deceased did not take the poison knowing it to be poison, and of her own volition. (e) The information should charge killing by poison and other means in separate counts. Sec. 1822, R. S. 1899; State v. Wagner, 78 Mo. 647; State v. McCollum, 44 Mo. 344; State v. Evans, 128 Mo. 406; Ann v. State, 11 Humph. 159; State v. Yarborough, 77 N. C. 524; Scheffer v. State, 22 Neb. 557; Bouts v. State, 8 O. St. 98; Hogan v. State, 10 O. St. 459; Robbins v. State, 8 O. St. 131; Snyder v. State, 59 Ind. 105; State v. McCormick, 27 Iowa 402; State v. Curtis, 70 Mo. 599. (2) The court erred in permitting witness Raymond Lyming to give any testimony because of his tender years, and his *voir dire* examination showed him to be incompetent. (3) There is a total failure of proof because the information charges in the same count the crime to have been committed by means of poisoning and by choking and strangling, and by a knife and a large heavy stone, while the evidence is that death resulted from carbolic

199 Sup.—43.

acid poisoning and from no other cause. Phillips v. State, 68 Ala. 369; People v. Hyndman, 99 Cal. 1; Jordan v. People, 19 Col. 417; People v. Bemis, 51 Mich. 422; Newcomb v. State, 37 Miss. 383; State v. Brown, 106 N. C. 645; Williams v. State, 35 O. St. 175; Com. v. Buccieri, 153 Pa. St. 535.  (4)  The court erred in admitting any evidence to show that deceased was pregnant, as a motive for defendant to commit the crime charged, without it first having been shown that defendant knew of her condition. Stokes v. People, 53 N. Y. 164; State v. Shelton, 64 Iowa 333; Son v. Territory, 5 Okla. 526; Pence v. Com., 51 S. W. 801; Wigmore on Evid., sec. 389.  (5)  The court erred in admitting any evidence the purpose of which was to show criminal intimacy between defendant and deceased without first requiring the State to establish the *corpus delicti.* Wharton's Crim. Ev. (9 Ed.), secs. 47-48, pp. 48-49. (6) The evidence is not sufficient to sustain the verdict and judgment of the court.  (a)  The evidence fails to establish the *corpus delicti.* Wills on Circum. Ev. (Ed. 1905), p. 297; State v. Dickson, 78 Mo. 438; State v. Jones, 106 Mo. 302; State v. Knolls, 90 Mo. App. 240; State v. Baker, 144 Mo. 323; State v. White, 189 Mo. 339; State v. German, 54 Mo. 526; Yalooski v. State, 82 Wis. 580; State v. Gragg, 122 N. C. 1082; Abbott v. Com., 42 S. W. 344; State v. Millmeier, 102 Iowa 692; Harris v. State, 19 Am. St. 837; Gay v. State, 60 S. W. 771; State v. Billings, 81 Iowa 99; Monk v. State, 27 Tex. App. 450.  (b)  The evidence fails utterly to establish the guilt of the defendant or to connect him in any way with the crime charged, and indicates that the jury were actuated by passion and prejudice. State v. Morney, 92 S. W. 1117; State v. Crabtree, 170 Mo. 642; State v. Nesenhener, 164 Mo. 461; State v. Dickson, supra; State v. Jones, supra; State v. Knolls, supra; State v. Gragg, supra; State v. May, 142 Mo. 152; State v. Heusack, 189 Mo. 295; State v. Glahn, 97 Mo. 692; Tilley v. Com., 90 Va. 99; State v. Huff, 161

Mo. 487; State v. Bartlett, 170 Mo. 658. (c) The evidence fails to establish, and there was no attempt to prove, that defendant knew carbolic acid was a deadly poison. State v. Yarborough, 77 N. C. 524. (d) There is not a scintilla of evidence that defendant was alone with deceased at any time within such time that he might have been the father of her unborn child, and in the absence of such proof there can be no inference that he was responsible for or knew of her pregnancy.

*Herbert S. Hadley,* Attorney-General, and *N. T. Gentry,* Assistant Attorney-General, for the State.

(1) The information, which was duly verified by the affidavit of the prosecuting attorney, is sufficient in form and substance. It charged that defendant killed deceased by administering to her a deadly poison, by choking and strangling her, by giving to her a mortal wound with a knife and by giving to her a mortal wound with a large rock. It may readily be seen that poison may be administered to a person, and after becoming stupified by reason thereof, the person may be choked, wounded with a knife and wounded with a rock; and all of said means contribute towards the killing. In fact, the evidence in this case fully justifies the conclusion that such happened on that evening near the bridge, when Winona Newton was murdered. That two or more methods of killing the deceased may be properly charged in one count in the indictment is now well settled. Wharton on Pleas and Precedents, sec. 129; State v. Barrington, 95 S. W. 258. (2) No error was committed in allowing the State's witness to testify to the fact that the deceased stayed all day at the defendant's home while defendant's mother was away; that they were there together all day; and that she heard deceased say "don't" to the defendant. It is true this evidence did not prove that the defendant murdered the deceased, but it was a circumstance which the jury had a right to consider; and it answered one of the argu-

ments now made by appellant's counsel, that there is no proof that defendant and deceased were ever together at any unusual time or place. It was unusual for defendant and deceased to spend the day together at defendant's home, in the absence of defendant's mother; and this circumstance showed that an intimacy existed between them. However, after hearing the evidence, the trial court ordered that the same be stricken out; so the error was cured, if error had been committed. (3) No error was committed by the trial court in permitting State's witness, Raymond Lyming, to testify, he being of tender years. Before giving his evidence, counsel for the defendant, and also the court, asked him various questions, and the court was satisfied that he was not only intelligent, but truthful. Such a matter must be left to the sound discretion of the trial court, and this court can not say that, in this instance, there was an abuse of that discretion. Rapalje on Law of Witnesses, sec. 7; R. S. 1899, sec. 4659. (4) Again, counsel for the appellant assume a contradictory position when they object to State's witness J. D. King testifying that he saw defendant in company with a little young woman about six o'clock one evening, going south on Baltimore avenue; and that the young woman had brown hair. In another place in their argument counsel insist that there was no proof that defendant and deceased were seen together at a time when they could have been guilty of adultery; and then they object to proof showing that they were together alone, at different times and different places. As heretofore suggested, this evidence was proper as tending to show an intimacy between them—an intimacy which existed in opposition to the father's wishes, which wishes were well known to the defendant. (5) It is impossible to see how even ardent and sympathetic counsel can say that there is no evidence to support the verdict of the jury. The intimacy that existed between the defendant and the deceased, the length of time that

said intimacy existed, the visits that she paid defend-
ant, the clandestine meetings that took place between
them, the efforts that defendant made to see deceased
after dark at the bridge, at the coal shed and elsewhere,
his repeated invitations to her to meet him there, their
correspondence, the contents of the letters, the use of
the fictitious names, the pregnant condition of deceas-
ed, the fact that deceased was calling on the defendant
for money with which to go to see a physician and to
buy medicine, and the fact that the defendant knew
that the deceased had passed two of her monthly per-
iods, conclusively show that the defendant was the
one responsible for the ruin of this little girl. In this
connection, it should be remembered that the defendant
said to a friend of his, ''I have got to hurry up and
meet the kid [referring to the deceased] between five
and six; poor Winona, she don't know right from
wrong, but she is a damn good kid to be with.'' In his
written confession the defendant stated that his moth-
er knew of the sickly condition of the deceased, that his
mother furnished her with money and with medicine,
and yet there is not a particle of evidence that tends to
show that the mother ever heard of deceased's condi-
tion or ever told her or wrote to her what medicine to
use. If the mother had learned any fact from deceased,
and if the mother had sent her any money or medicine,
it is strange indeed that that mother remained silent
on the subject when her only son was on trial for his
life. Being responsible for her ruin, it was natural
that the defendant desired to cover up his first crime,
and, like many others before him, he resorted to mur-
der. It can, therefore, be readily understood why de-
fendant was continually inviting the deceased to meet
him at nights, away from her home; and also why the
defendant was hiding around in the Newton coal shed
and elsewhere in the dead hour of the night. And it is
also easy to understand why the defendant failed to say
or do anything to deceased on those nights because her

father or her brother or her sister was with her. The
"red-ink letter" invited the deceased to meet defend-
ant at the very bridge where her dead body was after-
wards found; and that letter invited her to meet him
alone, and also stated that he had some medicine for
her. In accordance with that letter, the defendant went
to that bridge late on the afternoon of November 3rd,
and, like most other men about to commit a crime, he
tried to divert suspicion from himself. He told Ed
Marcus that he was the bridge inspector, and pointed
to the Newton house and asked who lived up there. The
deceased and her sister were in the act of getting sup-
per, when the deceased walked out on the porch, re-
maining there for a while. At this time Raymond Lym-
ing saw defendant standing on that bridge, saw him
jump down and conceal himself as a woman drove by
in a buggy, afterwards saw him wave his hand as he
looked toward the Newton house and saw the deceased
sitting on the back porch of said house. The deceased
arose, went into the house, procured a cup and left the
house, casting her eyes towards her father as she walk-
ed out of the room. As it was then getting dark, as the
weather was cold and as deceased had been sick all day,
it can not be supposed that she left that house on a
pleasure trip, especially at the time when she was need-
ed, or soon would be needed, to assist in the prepara-
tion of the evening meal. The finding of her dead body
the next morning, the cup, the empty bottle and the
poisonous fluid in her stomach show that she went to
that bridge, went in response to the invitation from the
defendant, went there alone, went there for the purpose
of taking medicine and that she procured the medicine
which the defendant intended that she should take. Un-
der the facts disclosed in this case, there is no occasion
to suggest suicide and the accidental falling of that
large rock on the body of deceased. The rock could
not have made the finger marks on her neck, and the
rock could not have made the cut places on the face and

head, testified to by Dr. Parker. The presence of the defendant at the very bridge where he invited deceased to meet him, his presence there a few moments prior to the time when deceased mysteriously left her father's home, and his waving to her to come, when taken in connection with his written invitation to her to meet him there, and to meet him alone, that he had some medicine for her, the defendant's motive for the killing and the manner in which death was produced conclusively show that the defendant was the guilty party. Cleverins v. Com., 81 Va. 787. Defendant undertook to explain his presence at and near the Newton home after dark by saying that he was hunting a negro who was charged with larceny; but never produced any witness to corroborate him in this regard, and could not even give the name of the negro, nor the article he was said to have stolen, nor the person from whom he took it. True, the defendant introduced some evidence tending to prove an alibi; which, if believed by the jury, might have been sufficient to justify his acquittal. But the jury, whose province it was, disregarded his evidence on that subject; and, when it is remembered that defendant's mother knew more of his whereabouts on that afternoon and evening than any one else, and that she remained silent at such an important time, we are forced to the conclusion that the jury properly disregarded the alibi theory. But even if there is evidence tending to prove an alibi, the appellate court will affirm the judgment where there is substantial evidence, as in this case, tending to support the verdict. State v. Harvey, 147 Mo. 69; State v. Smith, 190 Mo. 704.

BURGESS, P. J.—The defendant was charged in the information with murder, in the first degree, committed upon Winona Newton by administering to her carbolic acid, a deadly poison; and by choking and strangling her, and with assaulting her with dangerous and deadly weapons, to-wit, a knife and a large heavy

stone. Upon arraignment he pleaded not guilty. A trial was had in the criminal court of Jackson county, at which he was convicted by the verdict of a jury of murder in the first degree. From the judgment of conviction and sentence of death and from order denying him a new trial, and in overruling his motion in arrest, defendant has appealed to this court.

Defendant contends that the evidence did not warrant the verdict and that numerous errors were committed upon the trial, which entitled him to a reversal of the judgment upon the ground of the want of evidence to justify the verdict, and if this contention be not sustained, that the judgment be reversed and a new trial awarded because of numerous errors committed upon the trial.

From an examination of this enormous record we are convinced that in order to reach a decision in the case it will be only necessary to pass upon one question presented by the appeal, and that is the sufficiency of the evidence to sustain the verdict. The evidence of the State was entirely circumstantial and in order to have justified the verdict the facts and circumstances in evidence should be consistent with each other and with the guilt of defendant and inconsistent with any reasonable theory of defendant's innocence.

The theory of the State was that the defendant had been criminally intimate with the deceased resulting in her pregnancy, and in order to cover up his crime administered to her carbolic acid, a deadly poison, from the effects of which she immediately thereafter died. It was therefore necessary for the State to prove the body of the crime, or the fact that a murder had been committed by proof of the death of Winona Newton by the criminal agency of the defendant. The death of Winona Newton being undisputed, the question for our consideration is whether the evidence was so strong and convincing as to bring the case within the rule announced, and that her death was the direct re-

sult of the criminal act of the defendant. Circumstantial evidence was sufficient for that purpose if it was of such a character as to leave the inference of guilt the only reasonable inference to be deduced from the facts disclosed by the evidence. In order to justify the verdict of guilty, however, if the jury found the cause of death to have been ' through the administration of carbolic acid poison, the evidence must have pointed with conclusive force to that result and that the defendant administered the poison to the deceased.

Winona Newton was at the time of her death about fifteen years of age, and rather small for her age. She lived with her father, three brothers and two younger sisters in the suburbs of Kansas City, near 55th street and College avenue. The mother had been declared insane and sent to the lunatic asylum prior to the commission of the crime. The defendant was a single man, twenty-one years old, and by occupation a railroad detective.

A short distance from the Newton home was a bridge over a little creek; this bridge was situated near 55th street and Walrond road. Prior to living at the above-named place the father of the deceased resided near the home of defendant, or, rather, the home of defendant's mother. Defendant was apparently on friendly terms with deceased, especially after the time that she worked for and waited on defendant's mother during one or two sick spells. After deceased's father moved out on 55th street, deceased and defendant corresponded, often not signing their true names to the letters. Deceased had been taking medicine, and desired defendant to give her money with which to employ a physician. The letters indicate that defendant had been meeting deceased at night, clandestinely, and had failed to meet her after dark on one or two occasions. The evidence further showed that defendant went out to this little bridge twice after dark, and met deceased and her younger sister once. That defendant

admitted that he had been back of deceased's house and near the coal shed one night when she and her father passed by. On other occasions, shortly before her death, deceased visited the switch yards, where defendant was employed, and spent considerable time in company with defendant, going into a house alone with him. To other railroad men defendant stated that deceased was his sister, his sister-in-law, his niece, his cousin and his girl. Deceased was in poor health, having missed her menstruation twice; she suffered a good deal, and took such medicines as Peruna, Mountain Balm and Lydia E. Pinkham's Female Complaint. On Friday, November 3, 1905, deceased spent most of the day in the house, lying down on a couch; and her father and one brother spent most of the day doing some work in the cellar. About 5:30, p. m., just before dark, deceased's sister, Ada, commenced to get supper, and one of the boys suggested to let deceased cook some corn starch. Deceased got up and walked out on the back porch, where she remained for about five minutes, and then returned to the kitchen. Ada suggested to the brother to get up off of the lounge and let deceased lie down, but deceased replied that she did not care to lie down. Deceased then got a cup and put it under her arm, got a fascinator and placed it around her neck, looked at her father, and at Ada, and walked out of the kitchen onto the back porch. In a little while the corn starch was ready to be taken off of the stove, and Ada stepped to the porch and called deceased, but received no reply. After waiting still longer, Ada went and called again; she returned to the house and told her father of her inability to find deceased. Then one of the boys was sent out in the yard; he looked around the coal shed, privy and back yard, and returned with the word that deceased could not be found. Then the father and one of the boys went out with a lamp, made a careful examination of the premises, and went to two of the neighbors, met two or three people on the street, and went up to a

store.  After making there inquiries they returned and
had supper.  At ten o'clock the other son returned from
his work; then the whole family went to bed.  The next
morning the body of the deceased was found southeast
of and near the little bridge referred to, with a large
stone on top of her head.  There were finger marks on
the throat of deceased, a wound on the forehead, one on
the cheek and one over the eye.  There was also a clean
cut on each side of the face, made by a knife.  In the
mouth was the odor of carbolic acid, and an ounce and
a half of that liquid was found in her stomach.  The
empty cup which deceased took from home was found
on the ground near her dead body.  A further exami-
nation showed that deceased was pregnant, and had
been in that condition for about two months.

One of the State's witnesses, named Ed Marcus,
testified that he crossed that little bridge just before
dark that evening, saw defendant standing there, and
that he stopped and talked with defendant, he knowing
defendant by name.  The witness noticed that defend-
ant was looking around at the bridge very closely, and
asked defendant if he was the bridge inspector, defend-
ant replying that he was.  Defendant pointed to the
Newton house and asked Marcus if he knew who lived
in that house; to which Marcus replied that he (defend-
ant) went with a girl up there enough to know who lived
in that house.  Marcus stated that he then passed on,
leaving defendant still standing on that bridge; he
also stated that he noticed a horse and buggy standing
close to a fence near the bridge.

Another witness, Fred Grubb, testified that he pas-
sed near that bridge about that time, saw defendant,
and recognized him; that he saw deceased come out on
her back porch and sit down on the edge of the porch;
that defendant waved to her, and deceased got up and
went back into the house.

Defendant was arrested, and in his pockets were
found letters written by deceased to defendant, and one

letter written by defendant to deceased, which he had never mailed. In his statements to the police officers and to the prosecuting attorney defendant stated that he did not know that Winona Newton was dead; that he was not out there that afternoon, and knew nothing about it. He also admitted writing a letter to deceased in red ink, but claimed that all of the letters that he wrote to her were suggested by letters that he received from her; and that all of the money that he sent to her was sent because he thought his mother owed her for work. Defendant admitted that he had given defendant some money to buy shoes with, and also to buy medicine with; that deceased told defendant's mother that she had been wading in the creek and had missed her monthly sickness; that his mother prescribed for her, and told her that medicine would bring her around all right. The defendant further said that on his pay day he went over to meet deceased at that bridge, intending to give her some more money, and that he met deceased and her little sister; that he then gave deceased fifty cents to pay for mending her shoes. He also admitted writing letters to deceased, which he signed "Jesse," because he knew her father did not allow her to receive letters from a man. Defendant further admitted that his mother had told him that deceased was suffering with blood poisoning, and that deceased had talked to his mother about medicine for that trouble. In these statements defendant said that he was not out at that bridge on the night that deceased was murdered, but was with his mother at supper, and then went with his mother to the residence of a family named Jacobe, where they spent the evening.

This letter in red ink was read by Ada Newton, a sister of deceased, who testified to its contents as follows: "Where in the wide world have you been? Meet me at the bridge; meet me alone; I have some medicine for you. If you don't meet me send Ada, and tell me why you don't meet me. Kid, I have some money for

you. By, by, Dear.'' (Signed) ''Jesse.'' Ada Newton
further testified that she was acquainted with and rec-
ognized this letter as being in defendant's hand writ-
ing. That this letter was given to her by the postman,
and she gave it to and saw deceased read it; the wit-
ness reading it over deceased's shoulder. After reading
it deceased burned the letter. For several days prior
to receiving said letter, deceased had been away from
home, and had been staying with the Matney family,
where there had been a death; this was in the latter
part of October, 1905.

The night watchman of the telephone exchange
testified to having ten or twelve calls from the defend-
ant on the night of November 3rd; that defendant told
him once that he was at the pesthouse, then that he was
at the dog pound, then that he was at the police station,
and finally said that he did not believe that his little
brown haired girl and he were on friendly terms any
longer. This witness had calls from defendant till after
one o'clock that night; and also heard three or four
ladies talking at the same 'phone with defendant. In
October, 1905, two witnesses testified to overhearing
a conversation between defendant and another man, in
which defendant said, ''I have to hurry up and meet
the kid between five and six o'clock; poor little Winona,
she isn't very old, she don't know right from wrong;
but she is a God damn good kid to stay with.''

On behalf of the defendant, the evidence tended to
prove an alibi; he introduced several witnesses who
told of his whereabouts during the afternoon of Nov-
ember 3rd, and several who testified that the defendant
was at the Jacobes' after supper. These witnesses
testified that the defendant came to the Jacobe house
in company with the defendant's mother. His mother
did not testify. The defendant took the stand and de-
nied all knowledge of the murder of Winona Newton,
and denied ever having sexual intercourse with her.
There was also some evidence introduced contradicting

and tending to impeach some of the State's witnesses.

That Winona Newton died from the effects of carbolic acid poison is conclusively shown by the evidence, but as to whether administered by her own hand or by some other person, especially by the defendant, is a question demanding the most serious and careful consideration. The intimacy that had existed between the defendant and the deceased for so long a time, the visits that she made him, the clandestine meetings that took place between them, the repeated requests made by him for her to meet him, the contents of the letters that were found upon his person when arrested, the contents of the letter written with some red liquid, the giving her money upon different occasions to pay for mending her shoes and the purchase of medicines, her appeal for money with which to get a doctor, his statements made while under arrest, his remark to a friend of his some time prior to the homicide that "I have got to hurry up and meet the kid [referring to deceased] between five and six; poor Winona, she don't know right from wrong, but she is a damn good kid to be with," and the fact that there was no evidence that she associated with any other man, tends strongly to show that he was responsible for her unfortunate condition, but this falls far short of establishing the fact that he was her murderer. There was no evidence that he had ever obtained for or furnished her with the poison causing her death, or that he or she ever knew that she was pregnant at the time of her death, but upon the other hand the evidence tended to show that she thought she had taken cold, which had caused her monthly periods to cease, and that she was taking such medicine as she could procure in order to restore her normal condition. They had no quarrel but seemed to be upon the best of terms. What motive then could he have had in murdering her? There is not a scintilla of evidence in the record tending to show that he had any desire to break off his alliance with her; upon the contrary the evi-

dence clearly shows that he desired its continuance. There was therefore no apparent motive for the homicidal act by defendant, and while it does not follow that there was no motive because none appeared, and this is not conclusive of defendant's innocence, yet it is a very important factor in this case, as tending to show his innocence. [State v. David, 131 Mo. 380.]

Much stress is laid upon the fact that in the "red ink letter" written by the deceased to meet defendant alone at the bridge where the dead body was found, it was stated that he "had some medicine for her." The letter was written in October before the homicide, and in addition to asking the deceased to meet him at the bridge, asked her if she could not meet him to send her sister, Ada, who was then about twelve years of age. There is no evidence whatever tending to show that the medicine which defendant then had for the deceased was poisonous—upon the other hand it tends rather to show that it was not poisonous, otherwise he would not have intended to send it by her sister. It is said for the State that in accordance with that letter, defendant went to that bridge late on the afternoon of November 3rd, and like most other men about to commit a crime he tried to deflect suspicion from himself. But that letter was written in the month of October, and in it defendant asked deceased to meet him on the following Wednesday or Thursday evening, while the homicide was committed on the night of the third day of November, which was Friday. It does not, therefore, tend to show that defendant was ever at the bridge on the evening of the night of the murder.

One Ed Marcus, a witness for the State, testified that he saw the defendant at the bridge late in the evening of the 3rd of November, that defendant told him he was the bridge inspector, but he was so completely impeached, that he was unworthy of belief. Indeed the evidence upon the part of the defendant shows conclu-

sively that he was not at the bridge upon that evening, but was elsewhere.

Adelbert Myers, a witness, says this Marcus boy was at work for him on that day, and was with him all day until about half past five o'clock when he sent him to his (Myers') home; that when he, Myers, reached home about six or half past six o'clock, the boy was there and ate supper with his family, and after supper he and his wife, with this boy, went, in company with Martin Ragan and his wife, to the theatre, where they remained until late at night, when the boy returned with them and stayed at Myers' home all night. This testimony is corroborated by Mrs. Myers, who says the boy reached her home about half past five o'clock in the evening, brought their horse from the blacksmith shop, where he had been shod, and the boy remained at the house until her husband reached home, had supper with them and went with them to the theatre, in company with the Ragans. Martin Ragan and his wife both say Mr. and Mrs. Myers, with the Marcus boy, reached their house about 7:30 o'clock in the evening, and they all went to the theatre together and left together, and tell of talking to the boy on the way home; they tell of the attraction at the theatre that night, that it was amateur night, that Friday night is amateur night at the theatre, and that this particular attraction was at the theatre but one amateur night and that was on Friday night, November 3d, 1905, the night of this girl's death. This testimony is further corroborated by the testimony of a number of employees of Myers, and the Marcus boy was not recalled to deny their testimony.

That Marcus was not at the bridge the night of November 3d, is clear, and that he was mistaken as to the night, or committed wilful and corrupt perjury, is equally clear.

In State v. Huff, 161 Mo. l. c. 487, it is said: "Testimony completely impeached is no testimony at all,

and rests on the same basis, in legal contemplation, as though no testimony had been introduced. And when such a case occurs, relief will be granted by this court. [State v. Packwood, 26 Mo. 340; State v. Primm, 98 Mo. l. c. 373, and cas. cit.]''

Fred Grubb, a witness for the State, testified that he saw the defendant on the bridge the night of November 3, about 5:40 o'clock, just at dark, and although he had never seen him before in his life, and although he was one hundred and eighty-five feet from him, in a direct line, and could only see him when looking between the boards which formed the north banister of the bridge, he testified that the man he saw there was the defendant. But the little boy, John Newton, who knew the defendant well and who was with Grubb at the time, and had as good an opportunity to see the man on or near the bridge, failed to recognize him as the defendant. In contradiction of Grubb, defendant introduced the testimony of D. O. Spangler and his wife, Frank Embre, William Blane and his wife, Joseph Lowry, A. C. Cooper, Alice and Peter Jacobe, C. E. Freeman and his wife and the defendant himself, by all of whom it was proven that defendant was not present at the bridge at the time Grubb testified that he saw him there. Mr. and Mrs. Blaine testified that at the very time Grubb says he saw defendant at the bridge the defendant was in their place of business, at 8th and Walnut streets, six miles from the bridge, getting a hat for which he paid them two silver dollars and got in exchange the hat and fifty cents in silver, and they recognized the hat offered in evidence as similar to the hat Francis received from them, and they recognized the hat positively (by the work on it) as one they had repaired, cleaned and blocked; they go farther and tell us why they are able to fix the exact date and the time of their transaction with defendant: a lady whose name and address they give was visiting them on this even-

199 Sup.—44.

ing, and that lady arrived about half past four in the evening, and she was there when the defendant came in and the transaction with him was just before closing time (6 o'clock), was the last transaction of the day, and was after the lamps were lighted, and they say it was between half past five and six o'clock. If their testimony is true, the defendant could not have been at the bridge when Grubb claims to have seen him. The Blaines' testimony is corroborated by A. L. Cooper, who says he saw defendant at the entrance to the Bank of Commerce building at about five o'clock, and D. O. Spangler, who says he and defendant left the bank of Commerce building at about five o'clock and went to Tenth and Main streets (the Bank of Commerce building is at Tenth and Walnut streets, one block east of Tenth and Main streets), where they stood a few moments and at about 5:10 o'clock separated, the defendant going north on Main street, saying he had to go to Eighth and Walnut to get his hat. Frank Embree says he saw defendant a few minutes later (when it was growing dark and the lights in the restuarant were burning) pass a restaurant on the north side of Eighth street, between Main and Walnut, and talked with him a moment; that defendant was then going east toward the store of the Blaines; and the defendant relates these facts substantially as testified to by all of these witnesses, and says when he left the hat store he took a car and went home. He further says that after he left Spangler at Tenth and Main he stopped on his way to the hat store at the Owl drug store, and purchased a bolt of "easy strap."

Joseph Lowry says that defendant reached home about six o'clock and immediately after supper defendant and his mother left the house together, stating they were going to Jacobe's to spend the evening, and at about half past eleven o'clock they returned and with them the little Jacobe girl.

Mr. and Mrs. Jacobe testified that the defendant

and his mother reached their house about seven o'clock and remained until eleven or eleven-thirty that night, and they are corroborated in this by the testimony of Mr. and Mrs. Freeman, who testified that defendant and his mother reached the Jacobe home at two or three minutes before seven o'clock. It seems to us a more perfect and reasonable alibi has seldom been established, and, confronted with this testimony, the irresistible conclusion is and must be that Fred Grubb was mistaken in his identity of the defendant as being the man on the bridge; but even were his testimony true and if it were shown positively that defendant was upon the bridge when Grubb says he saw him, the evidence would still fall far short of proving that defendant murdered the deceased.

One Raymond Lyming was another witness upon the part of the State. This witness was a boy nine years of age, had attended school about two and one-half years, but had never gone to Sunday School or attended church. Being asked if he knew the meaning of an oath, he answered that he did, that his father told him what it was, but he did not know what they would do with him if he did not tell the truth. He was objected to as a witness by defendant because incompetent. He was, however, allowed to testify and stated that he saw the defendant at the bridge at about eight o'clock on the night of the homicide; that he was in fifteen feet of him when he lit a match to light a cigar and by the light of the match he saw his face. That he did not know him at the time, but recognized him when he saw him in the court room. But he also testified that at the time he saw defendant the witness was on his way home on horseback, and that John Newton, the brother of deceased, was riding behind him upon the same horse; that at the same time Winona and Ada were coming up there and she told John to hurry on home. Now the evidence conclusively shows that at the very time that the witness testified to having seen defendant at the

bridge both John and Ada were at home, so that it is manifest that the witness did not tell the truth, or that he was mistaken as to the night when he saw defendant, and we conclude that it must have been the latter.

The State seems to lay much stress upon the testimony of one Maudie Bowles, a witness for the State, to the effect that she heard the defendant say to another young man whom she did not know, "Why I have got to hurry up and go and meet the kid between five and six; poor Winona, she don't know right from wrong, but she is a damn good kid to be with," as tending to show that the defendant met the deceased at the bridge on the evening of the third of November, 1905, but the witness stated emphatically that said conversation (if indeed it ever took place) occurred between the first and the fifteenth of October, 1905. It, therefore, had no tendency whatever to show that defendant met and murdered deceased on the 3rd of November next thereafter.

It follows that there is not one iota of evidence worthy of belief which *even tends* to show that the defendant knew that the deceased was pregnant, that he ever threatened or had any ill-will or malice towards her, but on the other hand, it tends to show that they were upon the best of terms; or that he ever bought or otherwise procured or had in his possession any carbolic acid; or that he was at the bridge on the night of the murder, or that he ever administered or even had an opportunity to administer the carbolic acid to the deceased which produced her death, or that he had any connection with it; and, in order to reach the conclusion arrived at by the jury, they must necessarily have indulged in the field of conjecture, which is entirely too visionary to justify the taking of human life or to deprive a man of his liberty. At most, the evidence adduced only raised a suspicion against the defendant, and under such circumstances no conviction of crime should be permitted

to stand. In State v. Jones, 106 Mo. 1. c. 313, it is said, "Mere suspicion, however strong, will not supply the place of evidence, when life or liberty is at stake." In the case of State v. Scott, 177 Mo. 665, a conviction was sought on circumstantial evidence, and Fox, J., in speaking for the court, said: "We have carefully analyzed all the testimony as presented by the State . . . and while it may be said that it is calculated to arouse a suspicion of guilt of this defendant, yet suspicion or even strong probabilities of guilt do not authorize a conviction. Giving every circumstance its full force, and leaving out of view any testimony offered by the defendant, it falls far short of furnishing that clear and convincing testimony upon which the citizen should be deprived of his liberty. The law should be universal in its application; it should be applied to the humble and exalted alike. This defendant may be guilty, but the facts, as disclosed by the record in this case, fail to show it. If there was any substantial evidence upon which to base this verdict, it would not be disturbed, but, in view of the insufficiency of the testimony to authorize this conviction, we must decline to sanction it. . . . Resting upon the testimony of the State alone, it created but a suspicion of defendant's guilt, and, whether such suspicion was strong or doubtful, it did not authorize his conviction."

To the same effect is State v. Morney, 196 Mo. 43; State v. Crabtree, 170 Mo. 642.

Besides, the evidence tending to show an alibi was very persuasive at least, if not in fact established. We, however, agree with counsel for the State, that the facts disclosed by the record do not even suggest suicide, or the accidental falling of the large rock upon the body of the deceased. The rock could not have made the cut places upon her cheeks, but how they came there, and by whom the murder was committed, seems to be shrouded in mystery. These wounds and bruises were not however sufficient to cause the death

of the child—and according to the evidence did not do so. So that the conviction must stand or fall upon the allegation with respect to the poisoning.

While the conduct of the defendant towards and the treatment of the little girl in debauching her, was of the most reprehensible character, yet, upon a trial for her murder he was entitled to be tried just as any other person charged with crime, according to the same forms of law and rules of evidence, among which is, that when a conviction for crime is sought upon circumstantial evidence it must always be scanned with great caution and can never justify a verdict of guilty, especially of murder in the first degree, the penalty of which is death, unless the circumstances in proof are of such a character and tendency as to produce upon a fair and unprejudiced mind a moral conviction of the guilt of the accused beyond all reasonable doubt, and to be absolutely inconsistent with his innocence.

Our conclusion is that there was no substantial evidence to authorize the verdict, and that the judgment should be reversed and the defendant discharged. It is so ordered.

All concur.