**STATE of Missouri, Respondent,**

v.

**William PAIGE, Appellant.**

**No. 54170.**

Supreme Court of Missouri, Division No. 1.

Nov. 10, 1969.

**800**

John C. Danforth, Atty. Gen., Gene E. Voigts, First Asst. Atty. Gen., Jefferson City, for respondent.

Robert B. Randolph, St. Joseph, for appellant.

HIGGINS, Commissioner.

William Paige was convicted by a jury of murder, second degree; his punishment was assessed at 10-years' imprisonment in the penitentiary, and sentence and judgment were rendered accordingly. §§ 559.-020 and 559.030, V.A.M.S.

In question is the sufficiency of evidence to sustain the conviction.

William Paige was charged with the murder of his wife, JoAnn Paige, on or about July 8, 1967, by shooting her with a pistol. JoAnn disappeared in the early morning of July 8, 1967, and, on February 12, 1968, human skeletal remains were found which, under the state's theory of the case, were the remains of JoAnn Paige. Appellant concedes "all events concerning this case occurred in St. Joseph (Buchanan County), Missouri."

William and JoAnn Paige had been married twelve years at the time of her disappearance. He was 33 years of age, she was 27, and they have five children, ages five to twelve. On February 20, 1967, she filed suit for divorce and, on July 5, 1967, she received temporary allowances for support. Although the divorce was pending, JoAnn and William lived in the same house.

Between 5:00 and 5:30 p. m., July 7, 1967, Joyce Broadus, JoAnn's sister, and Cornelia Stillman, her mother, met JoAnn at the Casa Loma Tavern where they drank beer until 7:30 or 8:00 p. m. While in the lavatory at Casa Loma, JoAnn showed Joyce a "black small caliber gun, I would say a .22, and had a pearl handle on it," which JoAnn was carrying wrapped in

a black scarf in her black, patent leather purse.

JoAnn, Joyce, and Cornelia left Casa Loma and went in Cornelia's automobile to Joyce's home where Joyce changed clothes and the group was met by Joyce's boy friend, Francis Starr. The four of them proceeded to the Paige home, JoAnn and Cornelia in Cornelia's car and Joyce and Francis riding together. JoAnn changed into a green flowered sack dress and gold shoes decorated with sequins. She also wore a red wig, watch, wedding ring, engagement ring, and pearl necklace, and continued to carry her black, patent leather bag. The party left about 9:45 p. m. in the Starr automobile for the American Legion Club.

Upon arrival at the Legion Club, William Paige was seen parking his car across the street. The party went into the club, sat at a table together, and bought beer. William came to the table and asked JoAnn for some money for beer. She gave him some money; he went to the bar and purchased beer and came to the table. When he sat near JoAnn she moved to the other side of the table and he went to the bar. After drinking two beers each, the party of four proceeded to leave the club. As they walked past the bar, William got up and went down the stairs and outside ahead of them. He grabbed JoAnn's arm and she told him "that they were getting a divorce and that he knew he wasn't supposed to be around her and she wanted him to stop bothering her, and she asked 'What are you going to do when the divorce is final?' and Mr. Paige said 'There is nothing final yet.'" William released JoAnn's arm and she and Joyce crossed the street to Big John's Cafe. William followed and had an unheard conversation with JoAnn. The girls went to the rest room and, when they returned, William was gone.

JoAnn and Joyce left Big John's about 2:00 a. m., July 8, 1967, and crossed the street to Milton Bundy's Bar and rejoined Cornelia and Francis. They met Richard Massey, a friend of Joyce's, and she arranged for him to take JoAnn to Joyce's home. JoAnn and Richard left Bundy's between 4:00 and 4:30 a. m. in his black convertible automobile. Neither Joyce nor Cornelia ever saw JoAnn alive again.

Joyce, Cornelia, and Francis remained at Bundy's until about 5:15 a. m., when they went to the Paige home to get Cornelia's automobile. William Paige came from the Paige home, looked into the Starr automobile, and returned to the house. Joyce and Francis went to Joyce's home, arriving a little after 6:00 a. m., and found that JoAnn was not there. Around 7:30 a. m., Joyce called the Paige home and learned JoAnn was not there and, later that day, she reported to the police that JoAnn was missing.

Richard Massey had seen JoAnn and William earlier at the American Legion Club. He drank bourbon at the Legion and later at Bundy's where he agreed with Joyce to take JoAnn to Joyce's home. He left with JoAnn at about 5:30 a. m., drove to a filling station for gasoline and air, and then drove to the Seitz Packing Company parking lot, arriving about 6:00 a. m. Richard was employed at Seitz and his check-in time was 7:01 a. m. He left JoAnn in his car and went into the plant to change into his work clothes. About 6:50 a. m., he went to his car to roll up the windows. JoAnn was still in his car. As he started back to the plant, William Paige drove up the driveway "somewhat fast I would say" and drove off into the sewer. William was in the sewer three or four minutes, then drove out, parked in front of Richard's car, got out and asked Richard how JoAnn got there. William said nothing else to him. Richard asked William to move his car, which he did, parking it at the side of Richard's car. Richard went into the plant, leaving JoAnn in his car and William in the Paige car. He "punched in" at 7:01 a. m., and two or three minutes later he saw the Paige automobile leaving with William driving and

JoAnn beside him in the front seat. He never saw JoAnn again.

JoAnn was described as being 5'4½" in height, 95 to 100 pounds in weight, and her upper front left tooth was gold capped.

On February 12, 1968, the superintendent of the St. Joseph stockyards, while removing a manure pile, found a human skeleton on a manure pile east of the Seitz Packing Company and near a ready-mix concrete plant. Found on or near the remains were shoes, dress, and other clothing, red wig, pearl necklace, gold tooth, and black scarf identified as the clothing and apparel worn by JoAnn when last seen alive. Her black bag, watch, and rings never were found.

Sergeant James Rhoades of the Missouri State Highway Patrol removed the remains and other items from the manure pile. The area had a growth of horseweeds six feet in height. He took the skeleton to the Methodist Hospital where Dr. M. E. Grimes, a physician and surgeon and coroner of Buchanan County, made an examination. He found a small hole on the right side of the skull and a metal slug "about one centimeter by a half centimeter in size and had the consistency of soft metal" inside the skull. In his opinion, the metal slug was the cause of death. He also noted the upper gold incisor tooth in the skeleton.

Sergeant Rhoades later delivered the skeleton to John Edland, M.D., pathologist at University of Missouri Medical School. He found the skeleton to be that of a Negro female in the early twenties or thirties, slight build, 90 to 100 pounds in weight, 5'2" or 5'3" in height. When articulated, the skeleton measured 61½ inches. His opinion was that a gunshot wound in the head produced death. He found the upper left incisor tooth covered with a gold cap.

Kenneth Miller of the Missouri State Highway Patrol technical laboratory was of the opinion that the metal slug removed from the skull of the skeleton was the remnant of a .22-caliber lubaloy bullet. It

weighed 10.05 grains and .22-caliber short bullets weigh 29 grains.

Buchanan County circuit clerk records showed that JoAnn Paige was given a permit June 29, 1967, to purchase a ".22 caliber Rohm (pistol), Serial No. 1062196."

Cornelia Stillman saw JoAnn's pistol in the early morning of her disappearance while they were seated at a booth in Bundy's Bar. It was "pearl handled and black" and was in JoAnn's black patent leather purse wrapped in a black scarf. Sometime after the disappearance, one of the Paige children called and told Mrs. Stillman he had found a gun. She went to the Paige home and the gun was "on the dufold pillow in a brown sack." It was the same gun she had seen at Bundy's Bar in JoAnn's purse. She gave it to Glenn Thomas, Chief of Detectives of the St. Joseph Police Department, who acknowledged that Mrs. Stillman delivered a "22 caliber Rohm" revolver to him sometime between July 9 and September 13, 1967.

On the same day, and after Cornelia delivered the gun to Chief Thomas, William Paige was picked up by police on request of the prosecuting attorney. This was July 21, 1967. William had been questioned previously about his wife's disappearance on July 9, 1967. When he learned JoAnn's gun had been delivered to the police, he made several requests of the prosecuting attorney's office and the police for it. The police ultimately gave the gun to him and it was never again in possession of the authorities.

William Paige was employed at Westab Company in St. Joseph. His work shift for July 8, 1967, was from 7:00 a. m. to 3:30 p. m. Pursuant to company policy of docking an employee one-fourth hour for every eight minutes he is late for work, William was paid for 7¼ hours of work July 8, 1967. Time records showing the exact time he reported for work were missing. William's testimony generally denied any concern over his wife's conduct on the evening and early morning July 7

and 8, 1967. He denied driving into the ditch at Seitz Packing Company. He stated he went into Seitz to call his foreman and tell him he would be late. When he returned to his automobile he did not see JoAnn and he left to go to his home and to work. His theory of the gun's disappearance was that it was stolen from the glove box of his automobile. On cross-examination, he acknowledged that he and JoAnn had not been as compatible as they should have been; that on one occasion he destroyed a new coat that JoAnn had purchased; and that he was late for work July 8, 1967. His cross-examination of Joyce Broadus adduced that both JoAnn and Joyce feared for JoAnn's safety on the night of July 7, 1967. JoAnn was worried that William "might jump on her." He also acknowledged an anonymous telephone call prior to his trip to Seitz parking lot which advised him that his wife was there with another man, similar to what other callers had told him on other occasions.

Appellant contends, despite this evidence, that his motion for judgment of acquittal should have been sustained because:

"(a) There was no evidence that defendant shot his wife in the head;

"(b) There was no evidence that JoAnn Paige was shot in the head with her gun;

"(c) The presence of JoAnn Paige's gun in defendant's home after the alleged murder is no evidence of defendant's guilt;

"(d) There was no evidence of motive for Appellant to have committed the alleged crime;

"(e) The State failed in its burden of proof to show that the remains were those of JoAnn Paige."

In this circumstantial evidence case, " 'the circumstances, to warrant a conviction, must be consistent with each other, must tend to prove guilt, and not only must be consistent with the hypothesis of the defendant's guilt, but must be inconsistent with every other reasonable hypothesis, in-

cluding the hypothesis of his innocence.' * * * 'Where a chain of circumstances leads up to and establishes a state of fact inconsistent with any theory other than the guilt of the accused, such evidence is entitled to as much weight as any other kind of evidence; but the chain, as it were, must be unbroken, and the facts and circumstances disclosed and relied upon must be irreconcilable with the innocence of the accused in order to justify his conviction.' " State v. Pritchett, 327 Mo. 1143, 39 S. W.2d 794, 796–797[1, 2]. "In construing circumstantial or presumptive evidence in respect to the corpus delicti, we should proceed upon the theory, that defendant is presumed to be innocent, and that this presumption follows him, until the case is finally disposed of in court. It is the duty of the court * * * to ascertain and determine from the record whether * * * (the) conviction is sustained by substantial evidence. * * * It is equally as well settled that a judgment of conviction based upon suspicion or conjecture should not be permitted to stand." State v. Bowman, 294 Mo. 245, 243 S.W. 110, 117[3, 4].

The evidence in this case, when tested by these standards, demonstrates that appellant's contentions are without merit, and his conviction is thus sustained.

■ With respect to contention (e), the evidence shows that shoes, dress, red wig, and necklace were found on or near the skeleton and they were identified as items worn by JoAnn Paige when she was last seen alive. JoAnn was shown to have had a gold-capped incisor tooth; such a gold incisor was found on the skeleton and it fit into the jaw structure of the skeleton. The pathologist's description of the remains conformed to the description of the deceased in evidence, and the identification of the deceased as a Negro was a proper inference from the appearance of JoAnn's husband, mother, sister, and children as witnesses. Thus, the "material fact" of "identification of the victim" was estab-

lished by the prosecution. 40 Am.Jur.2d, Homicide, § 289, pp. 554–556.

With respect to motive, contention (d), the evidence that appellant destroyed a new coat purchased by JoAnn gave rise to an inference of violent temper. Appellant had been informed on previous occasions, as well as on the last morning of JoAnn's life, that she had been staying out at night with other men. JoAnn's suit for divorce supports an inference of difficulties between her and appellant; and an allowance was made for her against appellant two days before her disappearance. Appellant arrived at the Seitz parking lot "somewhat fast" and drove into the sewer. Occurrences and confrontations by William through the early morning of July 7, 1967, caused JoAnn and those who knew her to fear for her safety and, when last seen alive at about 7:04 a. m., July 8, 1967, she was in a car with appellant near where her remains were found. Despite appellant's protestation that he was not upset upon seeing his wife with another man, the evidence shows that marital difficulties existed between JoAnn and William, that he was displeased with her conduct, and that he could react violently, all of which supported inferences of irritation, anger, and jealousy toward his wife and showed an inducing motive for him to murder her. Cf. State v. Morney, 196 Mo. 43, 93 S.W. 1117, 1119–1120[2].

With respect to contention (b), there was evidence to show that JoAnn Paige was shot in the head with her gun. Sergeant Rhoades observed a hole in JoAnn's skull about the size of a lead pencil eraser. Coroner Grimes found the small hole in the right side of JoAnn's skull and, upon opening her skull, found a soft metal object identified by the highway patrol laboratory as a fragment of a .22-caliber bullet, and found as the cause of death by the pathologist, Dr. Edland. JoAnn obtained a permit to buy a .22-caliber Rohm pistol June 29, 1967. Her sister and mother saw a .22-caliber pistol, black with pearl handle, in JoAnn's purse during the incidents of July 7 and 8, 1967. No pistol was found by JoAnn's remains. However, JoAnn's mother found the same pistol she had seen on the evening of JoAnn's disappearance in a paper sack in appellant's home; she gave it to Chief of Detectives Thomas of the St. Joseph Police Department, July 21, 1967, and he received it as a ".22-caliber Rohm." Between July 21, 1967, and September 13, 1967, appellant made numerous attempts to recover the pistol and, after its delivery to him on September 13, 1967, it disappeared. Not only does this evidence support the finding that JoAnn Paige was shot in the head with her gun, it also negatives any suggestion of suicide because, if JoAnn were a suicide, it is probable that her gun and purse would have been found with her other effects and remains.

It has been shown that the remains were those of JoAnn Paige, that appellant had a motive for killing his wife, and that she died from a bullet in her head from her own gun. In addition, this and other evidence warranted a finding with respect to contention (a) that appellant was his wife's murderer. Richard Massey, who last saw JoAnn alive, saw her about 7:04 a. m., July 8, 1967, leaving the Seitz parking lot in William's car and with William driving. He drove north on the driveway leading from the parking lot and the photographs show that the driveway connects to an east and west street. The manure pile where JoAnn's remains were found is immediately east of the Seitz parking lot. Appellant was due at work at 7:00 a. m., July 8, 1967; he was late enough to be docked for forty-five minutes; and there is no accounting of his whereabouts between 7:04 a. m. and 7:30 a. m. except his own testimony. The murder weapon was found in appellant's home a few days after JoAnn's disappearance and, after he claimed it from the police, it disappeared from his possession. Appellant argues in connection with his contention (c) that the presence of JoAnn's gun in his apartment is no evidence of his guilt and that "the

mere presence of the gun in the Paige home * * * is at the most, a mere suspicion." No doubt there are many situations, e. g., State v. Nagle, 326 Mo. 661, 32 S.W.2d 596, State v. Matticker, Mo., 22 S.W.2d 647, in which presence of an item of evidence raises, at most, a suspicion; however, in this case, the gun was shown to be the murder weapon, was found in appellant's possession a few days after the victim's disappearance, and he is the last person shown to have had it in his possession. Presence of the gun in appellant's home is thus a critical incriminating fact of this case.

Nor does this case fail as in State v. Pritchett, supra, and State v. Buckley, 309 Mo. 38, 274 S.W. 74, where the court found only a strong suspicion of guilt. Other similar circumstantial evidence cases are not dispositive of other cases because each must be considered in its own posture; however, State v. Bayless, 362 Mo. 109, 240 S.W.2d 114, supports a determination of a sufficiency of evidence to convict William Paige. Bayless was the last person to be seen with the deceased, and he was seen leaving the area where the deceased was found beaten and choked to death. Trousers found in defendant's home were found to have a stain of human blood on them but it was not shown to be the blood of the decedent. Inconsistencies in witnesses' testimony were held for the jury's resolution. The court applied the test of State v. Pritchett, supra, and, in affirming the conviction of second degree murder, stated: "If the State's substantial testimony tending to implicate accused, when taken as true and considered with the legitimate inferences which may reasonably be indulged therefrom, supports the verdict of the jury, it must stand." State v. Bayless, supra, 240 S.W.2d l.c. 120[4, 5]. As demonstrated, the evidence in this case is not subject to appellant's specific attacks and, when considered in its entirety, supports the jury's verdict. Therefore, the court did not err in refusing to direct a verdict of acquittal or to set aside the verdict of guilty.

Appellant charges error in overruling his objection to mention in the state's opening statement of a common assault charge pending against him by his wife and contends the court should have declared a mistrial because:

"(a) The * * * reference was calculated to create prejudice * * * in that no evidence was offered to substantiate the remark;

"(b) The assistant prosecutor intentionally violated a pretrial order by asking an officer whether he questioned the Appellant about the alleged crime;

"(c) The cumulative effect of the * * * opening statement that Appellant had signed a waiver of rights, made incriminating statements, a common assault charge * * * was pending * * * and the attempted direct examination of the officer about questioning the Appellant was apparent bad faith and created the innuendoes that Appellant had mistreated his wife and had confessed to the alleged crime when, in fact, the assistant prosecuting attorney knew that Appellant never made any incriminating statements and always denied his guilt."

■■ A prosecuting attorney may outline by opening statement what he expects to show in evidence and the trial court is accorded discretion in determining whether he acts in good faith in making his statement. When made with reasonable ground to believe the facts stated can be proved, the statement is not improper, State v. Lindsey, 333 Mo. 139, 62 S.W.2d 420, 421–422[5–7], although facts outlined are not followed up by proof because evidence is either excluded or omitted, State v. Flinn, Mo., 96 S.W.2d 506, 509–510[1–7].

■ Concerning first the charge (a) that the permitted reference to the common assault charge was error because no such evidence was offered, the record shows that an offer of such evidence was made in the prosecutor's cross-examination of appellant. Even though appellant's objec-

tion to reference to the common assault charge was sustained this does not convict the state of bad faith within the meaning of the cited cases.

■■ With respect to references to incriminating remarks, charge (b), the record shows that the pretrial order suppressed any statements by the accused which may have been made prior to his being advised of his rights, and the court further stated that any other statement would be considered as it arose during trial. Thus, there was no violation of any pretrial order. The state did attempt, in a hearing outside the presence of the jury pursuant to the pretrial order, to present the statements mentioned in the opening statements and the offer was denied. This, too, was consistent with the cited cases, and impropriety, if any, was removed when the appellant testified to the circumstances of, and such statements, in presenting his own case.

■■ Charge (c) is a restatement of items (a) and (b) with added reference to the statement that appellant had signed a waiver of rights. The latter is not a matter for relief for the reason stated because the waiver was offered and received in evidence, and since none of the three complaints were, in themselves, matters of error, their cumulative effect does not constitute the error charged. Nor were any of these references attempts to recite and offer irrelevant evidence which the prosecutor knew could not be admitted as was the evidence of an assault of another student in the prosecution of a teacher for rape of his pupil in State v. Horton, 247 Mo. 657, 153 S.W. 1051.

In Point III appellant makes several charges which he contends affected his substantial rights and entitle him to a new trial. See Criminal Rule 27.20(c), V.A.M.R.

■ First, he complains that the coroner, without being qualified, was allowed to render an opinion as to cause of death.

Appellant made no objection to the coroner's qualifications and the record shows him to be a medical doctor engaged in medical practice as a physician and surgeon, in addition to his duties as coroner, and the cross-examination shows that appellant also sought expert opinion from Doctor Grimes.

■ Next is a complaint that the .22-caliber bullet was labeled Exhibit 22. No attempt is made to show how this coincidence could be error.

■ Appellant's complaints of the admission of hearsay testimony are without merit inasmuch as the transcript references to such evidence show they were adduced absent objection or through appellant's cross-examination.

■ Appellant's charge that the police receipt given by William Paige for the gun and the circuit clerk permit for JoAnn Paige to purchase a gun were in evidence without identification as official business records is without merit because there was no objection to their receipt in evidence and the transcript shows them to have been sufficiently identified for the purposes offered.

■ Finally, under this point, appellant charges that the state was permitted to conduct improper voir dire by asking jurors, "Could you and would you vote to find the defendant guilty?" This type question has been held to be an erroneous attempt to secure the pledge of jurors to convict. State v. Kiner, Mo., 441 S.W.2d 720, 722–723[3]. However, application of that principle is not an issue on this appeal because the transcript contains but a small portion of the voir dire examination, none of which shows any such questions to have been asked of the jury. See Civil Rules 82.12, 82.14, V.A.M.R.

■ Appellant's final point is a charge of plain error, Rule 27.20(c), supra, that "Whether requested or not, the court should have given an alibi instruction be-

cause a substantial portion of the Appellant's evidence was that he was someplace else when the crime was alleged to have been committed or that he did not have time to commit the alleged crime." This charge can be ruled summarily because, assuming the existence of evidence to support such an instruction, the trial court is under no duty to instruct on alibi unless requested to do so by the defendant, which request consists of preparing and presenting a written instruction with request that it be given. State v. Harris, Mo., 356 S. W.2d 889, 891[3–5]. See State v. Taylor, 118 Mo. 153, 22 S.W. 806.

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

SEILER, P. J., and HOLMAN, J., concur.

STORCKMAN, J., absent.