**STATE of Missouri, Respondent,**

v.

**Thomas R. STAPLETON, Appellant.**

No. 57228.

Supreme Court of Missouri,
Court en Banc.

Jan. 13, 1975.

———◆———

John C. Danforth, Atty. Gen., Karen I. Harper, Philip M. Koppe, Asst. Attys. Gen., Jefferson City, for respondent.

Alan G. Kimbrell, St. Louis, for appellant.

BARDGETT, Presiding Judge.

Thomas R. Stapleton was charged with murder in the second degree and convicted by a jury of voluntary manslaughter, a felony, Sec. 559.070, RSMo 1969, V.A.M.S. The jury could not agree on punishment and the court sentenced defendant to ten years' imprisonment. Notice of appeal was filed prior to January 1, 1972. This court has jurisdiction. Mo.Const., Art. V, Sec. 31(4), V.A.M.S.

Appellant's first point is that the evidence is insufficient to support the submission of murder in the second degree and to support a conviction of voluntary manslaughter.

Appellant and deceased, a 19-year-old girl named Donna Watts, first met on June 27, 1970, when Donna went to an automobile dealership where appellant was a salesman. Donna became interested in buying a certain car. Appellant, aged forty, had a date with Donna on the evening of June 30, 1970. After having dinner in downtown St. Louis and stopping at another place, appellant and Donna proceeded in appellant's car west on I–70 into St. Louis County. Appellant was taking Donna to the apartment of a girlfriend of Donna's where she was going to spend the night. Appellant asked Donna if she would like to stop at the Gaslight Inn, a cocktail lounge in the vicinity of the St. Louis Metropolitan Airport, and she agreed. They arrived at the Gaslight about 1:00 a. m., July 1, 1970, and were seated at a table with Larry Duncan, Paula Bailey, who lived with Duncan, and Rozena Hanlon, friends of appellant. Appellant ordered a drink but Donna did not do so. Appellant made a few sarcastic remarks to Donna and within a few minutes Donna asked to be taken home to her friend's apartment. Appellant and Donna left together at about 1:25 a. m. Although both of them had a few drinks earlier in the evening, neither was intoxicated. Larry Duncan and Paula Bailey left a few minutes later and walked to their apartment which was about a block away.

Fifteen or twenty minutes later, appellant came to Larry and Paula's apartment and asked to use the bathroom. Appellant ordinarily dressed very well, but when he arrived at the apartment his hair was messed up, his tie undone, and he was not wearing his jacket. He wanted to and did speak to Larry outside. Appellant told Larry that Donna was dead, that she had grabbed a gun and shot herself. Appellant wanted Larry to go along with a story that he was going to tell the police which was that when Larry and Paula left the Gaslight, appellant and Donna were still outside the bar and that another boy was

there with whom Donna left. Duncan testified appellant was very incoherent and scared stiff. Duncan kept asking appellant where the gun was and where everything else was and appellant kept saying, "in the car, in the car."

Appellant was very nervous. He was at Duncan's only about five minutes and left. Duncan told Paula Bailey what was going on and the two of them went downstairs looking for appellant and Donna but did not see them so they returned to their apartment and called the police. Officer Crank came to Duncan's apartment. Larry and Paula made a report of the matter to him after which the officer left.

About fifteen minutes later appellant returned to the Duncan apartment. He had a man's handkerchief with blood on it and asked Paula to flush it down the commode, but she did not do so, and later gave it to the police. Duncan told appellant the police had been there and that he, Duncan, was going to call them back. Appellant agreed that he had to talk with the police and waited for them to arrive. While waiting for the police to arrive, Paula testified that she kept asking appellant what happened; that appellant didn't really make much sense; he was upset and hard to talk to and incoherent. When she asked where the girl was, appellant could not answer. Paula asked him, "Where is her body at or her purse?" Appellant said, "Well, I don't know, haven't you seen her." Paula asked where the gun was. Appellant said, "I don't know—I guess she shot herself, and I guess it's in the parking lot laying there somewhere." Appellant said that Donna got in the car, picked up the gun, and "shot herself".

Officers Crank and Martin returned to the apartment, advised appellant of his rights and placed him under arrest. Officer Martin told appellant to direct him to the girl (Donna) and appellant did so. Officer Combs learned from a passerby that there was a lady lying in the alleyway at the Lambert Park apartments. He went to the area and found Donna sitting in a pool of blood and bleeding from the head. She was incoherent and taken to St. Louis County Hospital where she died July 6, 1970, from the gunshot wound. A .38 caliber bullet had entered near the left eye and exited over the right ear.

Appellant was taken to Woodson Terrace Police Department where he gave a statement to officer McGrath, who testified that appellant told him that he picked Donna up about 8:00 p. m. the previous evening; that they had dinner together and then arrived at the Gaslight Inn around 12:30 a. m. and left about 1:30 a. m. According to McGrath, appellant and Donna "got to the parking lot in front of the Gaslight, the girl told him to wait a minute—there was someone she wanted to talk to, and that the girl left him and went over and talked to this other gentleman. Then she came back to his car again. . . . Then Donna Watts left the car again and returned to this unknown man's car, and at this time she got in the car with this other man and then left the Gaslight Inn area. . . . (H)e sat around there for just a few minutes, . . . and he left the Gaslight and drove to Donna Watt's apartment where she was staying with a girl friend. . . . (A)s he arrived at the rear of the apartment he saw Donna Watts standing in this street or alleyway talking to this same gentleman again, and . . . she left this other man's car and came back to his car, got in the front seat, sat down, and as she turned to face the windshield of the car, she told him she couldn't take it any more, and she pulled out a gun and shot herself." Later Larry and Paula told him "to contact the police. . . . He then left the apartment and drove around for a while, and came back to the Duncan apartment again and told them to go ahead and contact the police."

Officer McGrath testified that Tom said he did not know where the gun was. Officer Crank and Scott Henderson took Tom to the St. Louis County jail. Crank testi-

fied that on the way Tom "made the statement, 'Well, I guess I really got my tit in a wringer this time for supposedly killing a bitch.'" Henderson testified that the statement was, "'Boy I have really got myself in a jam now.' The best way I can say it come out, that 'I am really in a jam and I am sucking the hind tit,' or 'My tit is in a wringer for supposedly shooting that bitch.'"

The police searched for the gun but to no avail. Paula Bailey testified that several months later she asked appellant what had happened to the gun and he said it was in the Missouri River. Donna's purse was found on the Gaslight Inn parking lot. The deceased died from being shot with a .38 caliber bullet which entered near the left eye and exited over the right ear. There was evidence that appellant owned a .38 caliber pistol.

The state rested. Appellant testified in his own defense. The following is a summary of his testimony as set forth in appellant's brief. He testified that he first met Donna when she came into the auto dealership on a Saturday. She was interested in a Mustang which needed some body work, and Tom gave her his card and told her "it would be a while before the car was fixed." She called once on Monday and twice on Tuesday. On the last call Tom made a date with her. Tom picked her up at her home and they went to Al's Steak House for dinner. They had two drinks each at the bar. Donna was drinking whiskey sours. They did not have any drinks at dinner. After dinner they went to the Robert E. Lee where they had two more drinks apiece. They next stopped at the Palace Bar but had no drinks there. On the way back out Highway 70, Tom had to brake suddenly, and a .38 caliber revolver which he carried in a brown paper sack slid out from under the seat and touched Donna on the foot. "She said, 'What is this for?' And I said 'Don't fool around with it. Put it under the seat.' And she reached on down and put it there, and we continued on where

we were going." Tom had purchased this gun over a year earlier when he was working nights as a bartender at the Tenderloin Room of the Chase-Park Plaza.

They stopped at the Gaslight where Tom ordered a drink and Donna had a coke. After leaving there, Donna directed him to her girlfriend's apartment where she was staying. They stopped in the alley behind the apartments at about 1:35 a. m. and sat there talking for about ten or fifteen minutes with the doors open and the motor running. Tom "bent over to light a cigarette with the cigarette lighter. . . . When I lit the cigarette, I came back up, and she had this pistol in her hand." She was holding the gun in her right hand. Tom said, "'Put that damn thing down.'" He "reached across her" to pick up the paper bag which was under her seat. As he did so, he "heard the mechanism—the click that operates the hammer of a revolver." She said, "'Is this how they work?'" and Tom said, "'Jesus Christ.'" "I reached across and I slapped the pistol, and when I slapped the pistol she had the gun in her hands—like in both hands, . . . and when I reached up she had the gun pointed . . . up in the air, and this is when I said, 'Put that damn thing down,' and when I hit the gun it immediately fired. My next reaction . . . I looked up and I was certain I would see a hole in the roof of the automobile. . . . There wasn't a hole in the car." "(H)er head was leaning back over the back of the car." "(S)he was beginning to fall and slid out of the car. . . . She literally just slid out of the car." Tom did not see "where it hit her". There was no safety catch on the gun.

"I panicked. . . . I put the car in gear and I drove out of the area and immediately went back to . . . Larry Duncan's apartment." He talked to Larry on the landing. "I don't recall what I said to the man, except I told him that the girl had killed herself and he said, 'What?' And I explained to him, and I said, 'I have got to get out of here; I don't want to get

you involved in this thing,' and I left, . . . I got in the automobile, and when I got in the interior light went on, and her purse was in the front seat and the pistol was there. I immediately grabbed the pistol and emptied it out, and now I started to drive away, and the windows are down, and I am literally throwing everything I can put my hands on. I threw out her purse; the cartridges I threw out. . . . I was driving, and the idea struck on me to get rid of this pistol, because it was my gun. . . . (W)hen I got to the Missouri River I saw there wasn't any traffic, and just threw the gun out." Referring to when he reached to pick up the purse, Tom said, "My hand slid and I felt this blood on the seat." Tom wiped his hand and the seat with his handkerchief. Tom went back to Larry Duncan's apartment. When the police arrived, he walked up to them and said, " 'My name is Tom Stapleton, and I am the man you are looking for in the shooting incident.' "

Tom directed officer Martin out to the apartment area. He told him that " 'some girl was fooling around with my pistol and killed herself. She just reached over and it went off.' " Officer Martin told him, " 'Well, you had better come up with a better story than that.' " The statements Tom made to officer McGrath about another man were false. On the way to the county jail, Tom did say that he guessed he had his tit in the wringer for supposedly shooting her, but he did not call Donna a "bitch".

This case was tried prior to the promulgation of Missouri Approved Instructions —Criminal Cases (MAI–CR) amd was submitted to the jury on a conventional second degree murder instruction and a conventional voluntary manslaughter instruction. Appellant requested and the court gave a death by accident instruction in accordance with the trial testimony of appellant. There was no evidence of provocation by the deceased nor of self-defense. This is a circumstantial evidence case and the court gave an instruction which informed the jury, inter alia, that:

"Where it is sought to convict a person of crime by circumstantial evidence alone, in order to convict, the circumstances proven by the State must be consistent with each other and wholly inconsistent with the innocence of the accused, and incapable of explanation upon any other reasonable theory except that of his guilt.

"And in this case if the circumstances proven by the State can be explained upon any other reasonable theory except on that of defendant's guilt, you should find him not guilty."

■ Although the test for determining the sufficiency of evidence to sustain a conviction is more stringent in a circumstantial evidence case, State v. Burke, 462 S.W.2d 701 (Mo.1971), the state's evidence, after conviction, must be accepted as true, together with all reasonable inferences deducible therefrom, and all evidence and inferences to the contrary must be disregarded. State v. Cobb, 444 S.W.2d 408 (Mo. banc 1969).

Appellant contends the evidence shows a total lack of motive on appellant's part to kill Donna or at least fails to show any basis for a motive to kill or harm Donna.

■ Motive is not an essential element of murder or manslaughter, State v. King, 433 S.W.2d 825, 827 (Mo.1968), but, as stated in State v. Hyde, 234 Mo. 200, 237, 136 S.W. 316, 326 (1911), "(W)here the defendant denies the act, the question of motive becomes important. Absence of motive in such case tends toward innocence." In some cases the absence of motive was the pivotal factor in the court's decision reversing the conviction for insufficient evidence. State v. Long, 336 Mo. 630, 80 S.W.2d 154, 158 (1935); State v. Wheaton, 221 S.W. 26, 29 (Mo.1920); State v. Bass, 251 Mo. 107, 157 S.W. 782 (1913); State v. Francis, 199 Mo. 671, 98 S.W. 11, 13 (1906). In the instant case

the state relies upon the sarcastic remarks appellant made to Donna at the Gaslight Inn to evidence motive to assault or kill Donna. The court has reviewed that evidence and concludes that the bickering shown in evidence which took place at the Gaslight Inn would not, of itself, be sufficient circumstantial evidence to sustain a conviction but could be considered by the jury with respect to the relationship between appellant and Donna.

But that is not all the evidence in this case. The court must consider the effect of the evidence concerning the appellant's flight from the scene; his efforts to get Larry Duncan to go along with the story appellant was going to tell the police which was that Donna left the Gaslight Inn in the car of another man, immediately followed by appellant's throwing Donna's purse onto the Gaslight Inn parking lot, the place where he told the police she had gotten into another man's car; appellant's throwing the gun into the Missouri River; his return to Duncan's apartment; his efforts to get Paula to flush the bloody handkerchief down the commode; and his admittedly complete fabrication of how the shooting occurred in his first discussion with the police.

For all that appears in the statement appellant gave to officer McGrath on the night of the shooting, Donna committed suicide with her own gun and appellant was merely a spectator. Appellant's trial testimony, although exculpatory with reference to who fired the gun, contains circumstantially inculpatory statements of flight, an attempt to procure false testimony, attempted destruction of evidence and destruction of evidence, and an admission of having previously sought to remove suspicion from himself by falsely stating that Donna committed suicide.

"Evidence to show that an accused has attempted to fabricate or procure false evidence or destroy evidence against him is always admissible as showing consciousness of guilt. State v. Matthews, 202 Mo. 143,

100 S.W. 420." State v. Smith, 355 Mo. 59, 64, 194 S.W.2d 905, 907 (Mo.1946).

In State v. Christian, 245 S.W.2d 895, 898 (Mo.1952), the court held that "An attempt to fabricate evidence is receivable as evidence of one's guilt of the main facts charged." See also 22A C.J.S. Criminal Law § 633. The main *fact* charged here is that appellant shot Donna Watts with a loaded gun and killed her.

Appellant argues that the evidence of appellant's conduct following the shooting are consistent with an accident and a panicky defendant. It was for the jury to determine whether or not the reasons appellant gave for his post-shooting conduct were true or false as well as deciding whether Donna was accidentally shot as described by appellant in his testimony at trial.

Insofar as the issue of submissibility of the case is concerned, the acts and conduct of the appellant following the shooting were consistent with an intent to remove suspicion from himself by fabricating a story of the event; by destroying the weapon; by attempting to destroy the bloody handkerchief; by throwing Donna's purse onto the parking lot at the Gaslight Inn; and by trying to get another person to go along with his admitted lies. These facts are consistent with guilt, inconsistent with innocence, and not capable of explanation upon any other *reasonable* theory except that of guilt.

State v. Paige, 446 S.W.2d 798 (Mo. 1969), was a murder second degree circumstantial evidence case in which the defendant was convicted of killing his wife Jo-Ann. With respect to the murder weapon the court said, at 804–805: "Appellant argues in connection with his contention (c) that the presence of JoAnn's gun in his apartment is no evidence of his guilt and that 'the mere presence of the gun in the Paige home * * * is at the most, a mere suspicion.' No doubt there are many situations, e. g., State v. Nagle, 326 Mo. 661, 32 S.W.2d 596, State v. Matticker,

Mo., 22 S.W.2d 647, in which presence of an item of evidence raises, at most, a suspicion; however, in this case, the gun was shown to be the murder weapon, was found in appellant's possession a few days after the victim's disappearance, and he is the last person shown to have had it in his possession. Presence of the gun in appellant's home is thus a critical incriminating fact of this case."

The court reviewed other circumstantial evidence cases in State v. Paige, *supra,* saying, "Other similar circumstantial evidence cases are not dispositive of other cases because each must be considered in its own posture; . . . [and] 'If the State's substantial testimony tending to implicate accused, when taken as true and considered with the legitimate inferences which may reasonably be indulged therefrom, supports the verdict of the jury, it must stand.' State v. Bayless, *supra,* 240 S.W.2d l. c. 120(4, 5)."

■ The court holds that there was sufficient circumstantial evidence to warrant the submission of the murder second degree instruction to the jury.

The appellant contends it was error to submit voluntary manslaughter to the jury on the grounds that there was no evidence to support it. Appellant's assertion that there was no evidence to support the manslaughter instruction is premised on the fact that there was no evidence of provocation by the deceased and therefore no evidence to support a reduction of the homicide from murder to manslaughter, citing State v. Jackson, 496 S.W.2d 1 (Mo. banc 1973); State v. Richardson, 495 S.W.2d 435 (Mo. banc 1973); and State v. Hubbard, 484 S.W.2d 224 (Mo.1972).

Appellant recognizes that the import of State v. Ayers, 470 S.W.2d 534 (Mo. banc 1971), is that unless there is "as a matter of law, 'an entire absence of evidence upon which to rest a verdict of guilty of manslaughter,'" the trial court must instruct on manslaughter, but contends that *Ayers*

should not be given retroactive effect. *Ayers* was decided after the trial of the instant case. In State v. Jackson, State v. Richardson, and State v. Hubbard, *supra,* the defendants were convicted of murder in the second degree, not manslaughter, and contended on appeal that the court erred in failing to instruct on manslaughter.

In *Jackson* and in *Hubbard* the court reviewed the evidence and concluded that there was no evidence of provocation and therefore there was no evidence which would support a verdict of guilty of manslaughter. *Jackson, Hubbard,* and *Richardson* were not circumstantial evidence cases. In *Richardson* the appellant did not elaborate on the point and it was not discussed at length in the court's opinion.

The state argues that manslaughter constitutes a lesser included offense of murder, citing State v. McQuerry, 406 S.W.2d 624 (Mo.1966), and State v. Chamineak, 343 S.W.2d 153 (Mo.1961), and contends that it would have been reversible error for the court to fail to instruct on manslaughter, citing Sec. 546.070(4), which requires the court to instruct on all questions of law arising in the case.

In State v. Clark, 412 S.W.2d 493 (Mo. 1967), the court held that the Laws of Mo. 1919, p. 256, abolished degrees of manslaughter by the enactment of a statute defining manslaughter, so far as material here, as, "Every killing of a human being . . . not herein declared to be murder or excusable or justifiable homicide, shall be deemed manslaughter." Sec. 559.070, RSMo 1969, V.A.M.S. The court held that the statutory definition did away with "heat of passion" (provocation) as a necessary element of the crime of manslaughter.

In State v. Williams, 442 S.W.2d 61 (Mo. banc 1969), the defendant was charged with murder in the second degree. The case was submitted on murder in the second degree and voluntary manslaughter and the defendant was convicted of manslaughter. On appeal Williams contended

the manslaughter instruction should not have been given because there was no evidence of lawful provocation which State v. Haynes, 329 S.W.2d 640 (Mo.1959), required as the basis for instructing on manslaughter in a murder second degree case. *Williams* reviewed the history of manslaughter in Missouri, approved the holding in State v. Clark, *supra*, and disapproved of the definition of manslaughter set forth in State v. Haynes, *supra*.

State v. Williams, *supra*, 442 S.W.2d at 64, held: "There is but one definition of manslaughter in this state, and that is contained in § 559.070, supra. There cannot properly be one standard as to the evidence required to authorize or require the giving of an instruction on manslaughter when a person is charged with murder, and a different standard as to the sufficiency of the evidence to support a conviction of manslaughter. For this reason we cannot agree that the standard announced in State v. Haynes as to the evidence required to authorize the giving of an instruction on manslaughter is correct. The proper standard is whether there is evidence to warrant a finding by a jury that defendant was guilty of manslaughter as that offense is defined by § 559.070, supra." The court in *Williams* however then went on to say, "We emphasize that there must be *proof* of facts tending to show want of premeditation and malice to warrant an instruction on manslaughter."

In State v. Ayers, *supra*, the defendant had been charged with murder second degree. The case was submitted to the jury on murder second degree and manslaughter. Ayers was convicted of manslaughter. On appeal Ayers contended that there was no evidence to support a conviction of manslaughter, that is to say that Ayers contended that under the holding of State v. Williams, *supra*, which required *proof of facts* tending to show want of premeditation and malice (provocation) before manslaughter could be submitted in a murder second case, the manslaughter instruction should not have been submitted. There

was no proof of facts—evidence—in *Ayers* tending to show provocation. Nevertheless the court held that the evidence in the case would support a finding of murder in the second degree or manslaughter.

In order for the evidence in *Ayers* to be found sufficient to submit manslaughter, it was essential that a portion of the holding in *Williams* be overruled. That was done. *Ayers* specifically referred to that portion of *Williams* in which it was held that "there must be *proof* of facts tending to show want of premeditation and malice to warrant an instruction on manslaughter" and held that statement to be erroneous because that statement misconceived "the relative functions of [the] judge and jury in a felonious homicide case."

Thus it seems clear that *Ayers* recognized that it was *not* necessary to have evidence of provocation—want of premeditation and malice—in a second degree murder case in order to say that the evidence was sufficient to submit manslaughter. Affirmatively put, *Ayers* holds that when there is evidence sufficient to submit second degree murder, there is automatically evidence sufficient to submit manslaughter and that it is the function of the jury to decide whether the defendant acted with premeditation and malice.

If the jury decides under the burden of proof instruction that there was premeditation and malice, the defendant is guilty of murder in the second degree. If the jury decides that the defendant killed the deceased but fails to find premeditation or malice (intent to kill), and does not find justifiable excuse or accident, if submitted, then the defendant is guilty of manslaughter as that crime is defined by Sec. 559.-070, RSMo 1969, V.A.M.S.

This does not mean that provocation can play no part in a second degree murder case. It plays a vital role with respect to the specific offense of murder in the second degree for if there is evidence of provocation the court must include that item in the murder second degree instruc-

tion and, if found to be present, precludes a conviction of murder in the second degree even though the defendant intended to kill the deceased. It does not however authorize complete exoneration of all felonious homicides. Manslaughter remains to be decided, and as to manslaughter provocation is not a defense.

In *Williams* the court found that there was evidence of provocation and on that basis upheld the giving of a manslaughter instruction. In *Ayers* the court did not find any evidence of provocation but upheld the giving of the manslaughter instruction holding that the evidence of second degree murder was sufficient to require that manslaughter be submitted under the court's duty to instruct on all questions of law in the case. Sec. 546.070(4); S.Ct. Rule 26.02, V.A.M.R.; State v. Ayers, *supra,* loc. cit. 538.

In short, the significance of State v. Ayers, *supra,* is the holding that the trial court is required to submit manslaughter in murder second degree cases on the basis of the evidence which supports the second degree murder instruction even though there is no evidence of lack of malice or premeditation—no evidence of provocation. *Ayers* requires this because it is the jury's function to decide the fact question of whether the defendant acted with premeditation and malice and that fact question does not exclusively depend upon the existence or nonexistence of provocation.

In State v. Johnson, 505 S.W.2d 94 (Mo.1974), the defendant was convicted of murder in the first degree in a circumstantial evidence case. On appeal the defendant asserted error in the trial court's failure to instruct on murder in the second degree. The conviction was reversed and the cause remanded for a new trial, the court stating, "However, if the evidence in this case would have justified the conviction of the lesser degree of homicide, second degree murder, the court was required to instruct the jury as to that offense whether requested or not. Rule 26.-02(6) V.A.M.R."

The court in *Johnson* further stated: "The principal distinction between first and second degree murder is the element of deliberation. State v. Ayers, 470 S.W. 2d 534 (Mo. banc 1971). 'It is "well established that the deliberation and premeditation necessary to constitute murder in the first degree may be inferred from the circumstances."' State v. Cuckovich, 485 S. W.2d 16 (Mo. banc 1972); State v. Davis, 472 S.W.2d 389 (Mo.1971). The only evidence in this case of deliberation is circumstantial. Assuming for the purposes of this opinion that an inference of deliberation was permissible, such an inference was not compelled, and if the jury determined not to draw such an inference the evidence then supported a finding of second degree murder. This is not a case in which, under the evidence, the accused is guilty of murder in the first degree or is entitled to be acquitted. See, for example, State v. Crow, 486 S.W.2d 248 (Mo.1972); State v. Terry, 472 S.W.2d 426 (Mo. banc 1971). Instead, the evidence authorized an inference of deliberation, but did not compel such a finding, and therefore it supported a finding of murder in the second degree. Under such circumstances, an instruction on murder in the second degree should have been given in order to afford the jury that choice. State v. Hyster, 504 S.W.2d 90 (Mo.1974); State v. Patterson, 484 S.W.2d 278 (Mo.1972). Failure to so instruct was reversible error."

*Johnson* and the instant case are circumstantial evidence cases. The principal distinction between second degree murder and manslaughter is that the former requires a finding of intent to kill (premeditation and malice aforethought). If the accused intended to kill the deceased, then he is guilty of murder in the second degree (unless provocation prevents conviction of murder in the second degree). The intent to kill may be inferred from the circumstances. In *Johnson* the only evidence of deliberation was circumstantial. Here, the only evidence of intent to kill is circum-

stantial. The evidence authorized an inference of intent to kill but did not compel such a finding. If the jury did not find the element of intent to kill, then the defendant could still be guilty of manslaughter because manslaughter does not require that element. Sec. 559.070, RSMo 1969, V.A.M.S.

■ Under the *Ayers'* modification of State v. Williams, *supra,* and in view of State v. Johnson, *supra,* the court did not err in submitting the lesser offense of manslaughter. In this case the evidence justified submitting the lesser homicide offense of manslaughter.

■ Appellant contends that State v. Ayers, *supra,* should not control the disposition of appellant's point concerning the manslaughter submission because *Ayers* was decided after the trial of the instant case and was not the law at the time this case was tried. Appellant argues that State v. Williams, *supra,* should apply. State v. Ayers held that the statement in *Williams* that there must be proof of facts tending to show want of premeditation and malice to warrant an instruction on manslaughter to be an *erroneous* statement of the law. The court will not apply to this case what has been held to be an erroneous statement of the law. The contention is overruled.

■ The appellant's next point is that the court erred in overruling appellant's motion for mistrial when the prosecutor asked a medical witness for the state "whether or not there was any possibility of recovery if she (deceased) had been immediately taken to medical attention" on the grounds that the prosecutor knew the

question would not elicit relevant testimony, and said question was not asked in good faith but to prejudice appellant.

Appellant objected to the question out of the hearing of the jury and the objection was sustained. No answer was given and the matter was not pursued. Generally the question of whether or not a mistrial is necessary rests in the sound discretion of the trial court. State v. Raspberry, 452 S.W.2d 169, 173 (Mo.1970). That discretion was not abused in this case. The point is overruled.

The judgment is affirmed.

PER CURIAM:

The foregoing opinion of BARDGETT, J., is adopted as the opinion of the Court en Banc.

DONNELLY, C. J., and MORGAN, HOLMAN, BARDGETT, HENLEY and FINCH, JJ., concur.

SEILER, J., dissents in separate dissenting opinion filed.[1]

SEILER, Judge (dissenting).

As the majority opinion states, this is a circumstantial evidence case. I respectfully dissent because I do not believe that the evidence, as set forth in the majority opinion, meets the standard required for conviction on circumstantial evidence alone.

This standard, as set forth in an instruction in this case, is as follows:

"Where it is sought to convict a person by circumstantial evidence alone, in order to convict, the circumstances proven by the State must be consistent with each other

---

1. In connection with the trial of future homicide cases, it should be noted that by an order adopted on this date the court has amended the Notes on Use with reference to MAI–CR 6.02 (Murder: First Degree); MAI–CR 6.06 (Murder: Second Degree); and MAI–CR 6.08 (Manslaughter). These amendments provide that beginning March 1, 1975, whenever the pleadings and evidence warrant the submission of first-degree murder and it is submitted under MAI–CR 6.02, then both MAI–CR 6.06 and MAI–CR 6.08 *must* be given. Likewise, if the pleadings and evidence warrant submission of second-degree murder (but not first-degree murder), and it is submitted under MAI–CR 6.06, then MAI–CR 6.08 *must* be given. The Notes on Use contain caveats with reference to cases wherein felony-murder (either in the first or second degree) is submitted.

and wholly inconsistent with the innocence of the accused, and incapable of explanation upon any other reasonable theory except that of his guilt.

"And in this case if the circumstances proven by the State can be explained upon any other reasonable theory except on that of defendant's guilt, you should find him not guilty."

This long established rule is a necessary corollary of the presumption of innocence, without which there can be no freedom in this state and country. When we start out, as we do, with the proposition that the defendant is to be presumed innocent until guilt is established in evidence, then it necessarily follows that in a case where the state is relying on circumstantial evidence to convict, but the circumstantial evidence is equally susceptible of an innocent interpretation, the state has failed to make a case.

In order to arrive at the conclusion that defendant intentionally shot and killed Donna Watts, the jury would have to make the following inferences:[1]

1. That defendant was present when the shooting occurred.

2. That defendant had hold of the gun.

3. That defendant pointed the gun at Donna Watts and intentionally pulled the trigger.

4. That defendant fabricated the stories about the circumstances of the shooting and acted as he did after the shooting because he knew he was guilty.

The majority opinion says that " . . . the acts and conduct of the appellant following the shooting were consistent with an attempt to remove suspicion from himself by fabricating a story of the event; by destroying the weapon; by attempting to destroy the bloody handkerchief; by throwing Donna's purse on to the parking lot at the Gaslight Inn; and by trying to get another person to go along with his admitted lies."

The opinion goes on to say that, "These facts are consistent with guilt, inconsistent with innocence, and not capable of explanation upon any other *reasonable* theory except that of guilt."

However, there is no direct evidence in this case that defendant had hold of the gun or that he intentionally pointed it at Miss Watts and pulled the trigger. Both of these inferences have to rest on proposition No. 4 stated above, that the defendant fabricated stories and did the acts he did after the shooting because he knew he was guilty. The difficulty with this is that the stories told by defendant and his actions after the shooting are ambiguous—they can be explained as well on the theory that defendant was trying to divert suspicion from himself, not because he was guilty, but because he realized that suspicion would inevitably fall on him, that he knew his protestations of innocence would depend on his word alone with no eyewitness to support him and feared the authorities would not believe the truth, that he was scared and panicky, and his ability to think calmly and cooly had disappeared. The statements and conduct relied on by the majority are equivocal.

The majority opinion relies on State v. Christian, 245 S.W.2d 895 (Mo.1952) for the proposition that, "An attempt to fabricate evidence is receivable as evidence of one's guilt of the main facts charged", and points out that the main fact charged in the present case is that defendant shot Donna Watts with a loaded gun and killed her. There are several important differences between State v. Christian and the present case. In the first place, it was conceded in the former that the state had made a submissible case. The only argument on appeal was over trial errors, and

---

1.  Both the second degree and manslaughter instructions in this case required the jury to find defendant shot her "wilfully", which was defined in the instructions as meaning "intentionally, not accidentally."

the above quotation related to admissibility of certain exhibits, not to whether there was a submissible case. In the second place, what the defendant attempted to do in State v. Christian was not ambiguous and susceptible of an innocent explanation, whereas the contrary is true here. In the Christian case defendant had written two notes to another inmate in the jail, trying to get the other inmates to agree to testify that money found in defendant's possession and identified as money from the bank which defendant and two others had robbed, had been given to defendant by some unidentified third man, and that defendant had nothing to do with the bank robbery. This attempt to fabricate evidence was susceptible of no innocent explanation. That is not true of the conflicting stories and the actions taken by defendant in the present case. Everything that defendant did can be explained on the basis that he was innocent, but was fearful that no one would believe the true facts.

There is no evidence on which it can reasonably be said that anything occurred between defendant and Donna Watts sufficient to impel defendant to take her life or seal her lips. There is nothing to show animosity, angry hostility, emotion, or passion on the part of defendant likely to lead to murder. It may be that the evening had not been a social success and perhaps defendant did not intend to ask Miss Watts out again, but to say that there was the slightest motive for defendant intentionally to shoot and kill Donna Watts is far-fetched to an extreme and not supported by any evidence.

Because of the ambiguous nature of the circumstantial evidence relied on to make a submissible case, consideration of the complete lack of motive of the defendant cannot be avoided in determining whether the circumstances are such as to be incapable of any reasonable explanation other than that of guilt. We know from common experience of life that sane men do not intentionally shoot other persons without a motive, even though motive is not an element of criminal homicide, and there are cases where guilt is so clearly established that motive becomes immaterial. But in this case guilt is not clearly established and absence of motive makes the circumstantial evidence even more ambiguous and equivocal.

With no motive to kill Miss Watts appearing, how can it be said that the particular circumstances relied on to convict the defendant are incapable of explanation upon any reasonable theory except that of guilt? If a motive had been established, then defendant's statements and actions would lose their ambiguity and duplexity and would fit neatly as being consistent with guilt and inconsistent with innocence. Lack of motive is as much a fact as presence of motive would be. Lack of motive is consistent with innocence, not guilt, and this is especially true where the relationship between the two principals was as brief and casual as it was here. Absence of proof of motive under the facts of this case becomes a fact to be reckoned on the side of innocence. Therefore, in the face of lack of motive, the circumstances proven by the state lose their consistency with each other, because absence of motive is not consistent with fabricating evidence to divert suspicion because of knowledge of guilt. It should be said of this case, as was said in State v. Concelia, 250 Mo. 411, 424, 157 S.W. 778, 781 (1913), another circumstantial evidence case, " . . . But when the facts exist in a case as they occur here, if there is no motive shown, no guilt can, with any sufficient legal certainty be attributed to defendant . . ."

Two cases strongly relied on by the majority opinion are clearly distinguishable from the facts in the case at hand. One is State v. Paige, 446 S.W.2d 798 (Mo.1969), and the other is State v. Bayless, 363 Mo. 109, 240 S.W.2d 114 (1951). Both are circumstantial evidence cases where the proof is much stronger and more convincing than in the present case and where there was a definite motive shown. The majority opinion stresses the fact that in the Paige case

the "murder" weapon was found in defendant's possession. In both the Paige case and the Bayless case there was no doubt that the death of the victim came about through criminal, not innocent, means. The sole question was who had committed the murder, not whether or not there was a murder. In the Paige case, the victim was found under circumstances which ruled out suicide, although the victim had been shot through the head. In the Bayless case, the deceased had been choked to death and badly beaten. In the case before us, there is no question that Donna Watts was shot with defendant's gun, but it would not be accurate to refer to it as the "murder" weapon in the sense used in the Paige case. The whole question here is whether the shooting was suicide, accidental, or intentionally done by defendant. Thus, defendant's disposing of the gun does not carry with it all the significance that was legitimately attached to the finding of the gun in defendant's possession in the Paige case and the subsequent disappearance of the gun.

There is not enough in this case in my opinion to overcome the presumption of innocence. The circumstantial evidence is equivocal. Convicting on equivocal circumstantial evidence is dangerous and always has been. Several centuries ago, in 1626, in a case occurring in Warwickshire reported in Coke Third Institute 232, an uncle, charged with the murder of a niece who had disappeared, produced another child to impersonate the niece. The fraud was discovered and the uncle was hanged. In truth, the niece had run away and at the age of 16 returned to claim her property.

While it is true defendant had an opportunity to commit the crime charged and his subsequent actions are bound to raise suspicions as to his conduct, it has long been the law in Missouri that circumstantial evidence showing opportunity and creating suspicion is not sufficient to make a submissible case, one of the latest cases so declaring being State v. Morse, 503 S.W.2d 450 (Mo.App.1973). The facts of the instant case bring it squarely within the rule stated in State v. Ruckman, 253 Mo. 487, 501, 161 S.W. 705, 708 (1913): "All the facts and circumstances shown by the state's evidence could exist and yet the defendant be innocent of any crime. The evidence as a whole leaves too much room for doubt and mistake and does not possess sufficient proof of guilt to authorize the state to deprive defendant of his liberty."

As I examine the facts before us the case should not have gone to the jury in the first place, but once it did I cannot but believe the jury permitted its suspicions of guilt to govern the verdict. These suspicions were very likely fortified in their eyes by the testimony that defendant referred to the deceased as a "bitch", the fact defendant was 40 years of age while Miss Watts was only 19, and the speculative idea that if defendant had promptly obtained medical attention Miss Watts might not have died, none of which eliminates the legal inadequacies of this circumstantial evidence case.

In my opinion, on the evidence before us, the state has not carried its burden and the conviction should be reversed.