STATE of Missouri, Respondent,

v.

Frank HYSTER, Appellant.

No. 57491.

Supreme Court of Missouri,
Division No. 2.

Jan. 14, 1974.

John C. Danforth, Atty. Gen., G. Michael O'Neal, Asst. Atty. Gen., Jefferson City, for respondent.

Robert C. Babione, St. Louis, for appellant.

FINCH, Judge.

Defendant was found guilty of murder in the first degree by a jury which fixed his punishment at life imprisonment. His appeal was taken November 16, 1971, which vests jurisdiction in this court.

Questions raised on this appeal involve the admissibility of statements of the defendant to police, admissibility of evidence concerning the defendant's intellectual ability as bearing on the voluntariness of his statements, and the action of the trial court in refusing to instruct on second degree murder and manslaughter. We grant a new trial on the basis that such instructions should have been given and recite such portions of the evidence as are necessary to a resolution of that issue.

At 4:25 A.M. on May 17, 1970, the St. Louis Police Department received a call reporting a death at 5925 Theodosia in the City of St. Louis. Officers went to the apartment at that address where they found defendant seated in the kitchen and the body of the victim, Pinky Herret, on a bed in a room adjoining the kitchen. Subsequent examination disclosed multiple contusions of the face and scalp, chest and abdomen, plus a jagged laceration at the apex of the vagina which extended down to both femoral arteries on either side. Cause of death was described by the doctor who performed an autopsy as "trauma, external force, or laceration, whatever happened around her head and neck, with

blood loss, cerebral concussions and multiple contusions over the body."

When the officers arrived at the scene, defendant was 'somewhat nervous and, although not intoxicated, had been drinking. There was blood on some of his clothing which proved to be the same type as that of the deceased. He also had traces of blood on his hands but this was not analyzed or typed as to whether it was human blood. The apartment was found in a state of disarray.

One of the officers, after reading the Miranda warning from a card which he carried, interrogated defendant at the scene. Defendant stated that he had been living with the deceased for about six years, that they had had several fights previously, and that they had a fight that night in which he had used his fists but did not recall using a knife.

Defendant was taken to police headquarters where at around 7:00 A.M. he was interrogated further after the Miranda warning was repeated.

At this time defendant told the officers that when Pinky Herret came home she had been drinking and he also had been drinking; that they continued drinking and that they got into a fight and he cut her several times with a small knife but he did not stab her. He stated that they then sat down at the kitchen table and Pinky wanted coffee and some hog's head cheese. He went to the store and got them, after which they ate and then laid down on the bed for a while. He was awakened about 8:30 P.M. and got up and let Pinky's son Michael into the apartment. He continued by saying that he went back to sleep and was awakened the next morning by the son turning on the kitchen light, and when that occurred he saw that Pinky was dead.

In the course of this interrogation the defendant began to cry and get upset, so Sgt. LaGates, who was interrogating the defendant, went and reported this to Sgt. Green. Sgt. Green came into the room and began to ask defendant as to his medical history, preparatory to taking him to the hospital. The defendant spoke up and said, "I loved her so much, I don't know why I cut her." The defendant was then taken to the hospital for examination.

In addition to offering the testimony of the officers as to what they observed at the scene and the statements made to them by the defendant, the State called Michael Herret, the 16-year-old son of the deceased. He testified that he had seen the defendant at the Theodosia apartment at about 6:00 P.M. on May 16, 1970, and that defendant said to him at that time that he was going to kill Michael's mother, Pinky. Michael testified that he left the apartment and went to his sister's house to play cards. He returned about 8:00 P.M. and saw his mother in bed. He shook her but she only moaned and did not reply. He went out again and returned about 3:00 A.M. He saw the defendant and his mother in bed and noticed blood on the sheets. Michael went to bed but about 4:00 A.M. the defendant awakened him and reported that his mother was dead and he was going to call the police.

Defendant testified on his own behalf. He stated that he arrived home at about 6:00 P.M. on May 16, and that Pinky arrived shortly thereafter. They talked of going out to eat but they then played some records and drank some beer and decided to have cold cuts at home instead of going out. Defendant went to the store to get the cold cuts and also brought back a six-pack of beer and a half pint of gin. They then ate, after which they laid down on the bed and went to sleep. Pinky awakened him later to let Michael in the apartment. The next morning he was awakened by Michael, at which time he discovered that Pinky was dead. He denied stabbing Pinky and also denied that he had told Michael that he was going to kill her.

The defendant also called Sgt. LaGates and developed testimony that Michael Herret had told the Sergeant that when he came in about 3:30 A.M., his mother was

lying on the bed in the same position he had seen her earlier, that he asked defendant what was wrong and the defendant replied he didn't know, that Pinky had come home that way, and that he had asked his mother if she wanted to go to a doctor and she had said "No," after which Michael went on to bed.

We consider first the question of whether defendant was entitled to instructions on murder in the second degree and manslaughter. Both were requested, but the trial court refused to give them, explaining that in his judgment the evidence disclosed that the defendant was guilty of murder in the first degree or was not guilty at all.

■ This Court has held on numerous occasions that where the evidence points only to guilt of first degree murder, and not to any lesser degree of homicide, the court is not required to instruct on lesser degrees. State v. King, 433 S.W.2d 825 (Mo.1968); State v. Terry, 472 S.W.2d 426 (Mo. banc 1971); State v. Crow, 486 S.W.2d 248 (Mo.1972). In each of these cases the court analyzed the evidence and concluded that if defendant was guilty, it necessarily was of murder in the first degree. For example, in King the court observed that the evidence pointed to a killing by one lying in wait, which could be only murder in the first degree. In Terry the court held that evidence pointed only to guilt of first degree murder, and the defendant's evidence was that he was somewhere else at the time of the murder. In Crow the issue was whether defendant or some other person had wound a cord around the victim's neck and then tightened it with a tire tool until the victim died.

■ The question we must resolve is whether this case is comparable to those represented by King, Terry and Crow. We conclude that it is not. Clearly, there was ample evidence in this case to justify the court in submitting the question of guilt of first degree murder. The nature and extent of the multiple wounds on the victim's body, plus the testimony of Michael Herret that defendant told him earlier on May 16 that he was going to kill Michael's mother, would support a verdict of murder in the first degree. However, there was other evidence which, if belived by the jury, would justify conviction of a lesser degree of homicide. The State's evidence included statements or confessions from defendant in which he said that he and the victim had been drinking, that they had fought on various previous occasions, and had another fight that night in which he beat and cut Pinky Herret. Other evidence supporting the possibility that Pinky was injured in a fight (possibly a drunken one) was the testimony of the officers that when they arrived at the scene they found the apartment in disarray and observed that defendant had been drinking. From the foregoing evidence, admitted as a part of the State's case, the jury could have found that Pinky Herret was wounded in a fight between her and the defendant and that there was an absence of deliberation on the part of the defendant, and perhaps an absence of premeditation or malice. It was for the jury to resolve the question of which version to accept. Under such circumstances, instructions on murder in the second degree and on manslaughter should have been given in order to afford the jury that choice. State v. Williams, 442 S.W.2d 61 (Mo. banc 1969); State v. Ayres, 470 S.W.2d 534 (Mo. banc 1971); State v. Patterson, 484 S.W.2d 278 (Mo. 1972). Failure to give such instructions constituted reversible error.

In view of the fact that on retrial it seems apparent that the State again will offer testimony as to statements made by the defendant and that the questions of whether defendant was adequately warned as to his constitutional rights, whether what he said or did was sufficient to constitute a waiver of such rights, and whether such statements were voluntary will arise, we proceed to consider those questions.

.

Prior to commencement of the trial herein, defendant moved to suppress the three statements made by him to the officers. A hearing was held thereon, after which the motion to suppress was overruled. In so ruling, the court found beyond a reasonable doubt that the statements were freely and voluntarily made by defendant after he had been given warnings as required by Miranda, that he knowingly and intelligently waived his rights thereunder, and that he had sufficient mental capacity to understand the warning and to knowingly and intelligently waive his rights thereunder.

We conclude, in the first place, that there was evidence of ample warning to the defendant as to his constitutional rights. Both at the apartment before defendant was ever interrogated and again at police headquarters a little later, the officers read the standard Miranda warning to defendant which advised him that he had a right to remain silent, that anything he said could and would be used against him in court, that he had a right to have a lawyer with him while he was being questioned, and that if he couldn't afford a lawyer one would be appointed for him before any questioning.

There was also adequate evidence of conduct on the part of the defendant which could be found to be a waiver by defendant of his constitutional rights. At the apartment, after Sgt. Tumminello read the Miranda warning, he asked defendant whether he understood what the officer had told him. The defendant answered that he did understand and thereafter when asked what happened, recited his first version of what had occurred. A little later at headquarters when Sgt. LaGates again read the Miranda warning to defendant and asked whether he understood, defendant replied that he understood his rights and wanted to make a statement. The foregoing evidence was sufficient to support the finding by the court that defendant waived his right to counsel or to remain silent. State v. Hughes, 460 S.W.2d 600 (Mo.1970); State v. Alewine, 474 S. W.2d 848 (Mo.1971); State v. Hamilton, 490 S.W.2d 96 (Mo.1973). This is not a silent record regarding waiver to which the court made reference in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966).

With reference to the third statement to Sgt. Green in which defendant said, "I loved her so much, I don't know why I cut her," there was no additional warning, but one was not required. The prior warnings given by Sgts. Tumminello and LaGates were sufficient to advise the defendant of his rights. State v. Smith, 415 S.W.2d 748 (Mo.1967); Evans v. Swenson, 332 F.Supp. 360 (D.C.Mo.1971). In addition, the statement was a volunteered one made during the discussion of defendant's prior medical history and was not in response to interrogation by the officers with respect to the homicide in question. Under such circumstances, no warning was necessary. Gregg v. State, 446 S. W.2d 630 (Mo.1969).

Finally, we consider admissibility of evidence as to defendant's mental capacity when offered with reference to a determination of voluntariness of defendant's statements or confessions.

At the hearing on the motion to suppress herein, the defendant called Dr. Jon Tek Lum, a psychiatrist from Malcolm Bliss Hospital. Dr. Lum had examined the defendant for the purpose of determining whether he was competent to cooperate with counsel and stand trial. The doctor filed a written report in which he concluded that while defendant was a moderately retarded patient and had some type of convulsive disorder, he was competent to stand trial and could not be found not guilty by reason of mental illness. No hearing on the doctor's written report was held because counsel for defendant did not contest the report or put in contention the defendant's ability to stand trial or to cooperate with counsel.

The defendant called Dr. Lum in connection with the motion to suppress for the purpose of showing by him that defendant had a low I.Q. and lacked capacity to understand the Miranda warning, and hence that statements by the defendant to police after the warning were not in fact voluntary. The court permitted Dr. Lum to testify as to his examination and findings, but when counsel sought to ask whether statements made pursuant thereto would be voluntary, the court, after first sustaining an objection thereto, ultimately admitted the evidence for the record on appeal, but expressed the view that such evidence was entitled to little or no weight. The court took this position on the basis that the issue which defendant sought to raise was inseparable from the issue of the defendant's ability to stand trial.

During the actual jury trial, the defendant failed to call Dr. Lum as a witness but did seek to have the medical records librarian from Malcolm Bliss Hospital read into the record an unexplained and uninterpreted recitation from the defendant's medical history that the doctor found that he had a low I.Q. The court sustained an objection to this evidence concerning the defendant's I.Q.

■ In Coney v. State, 491 S.W.2d 501 (Mo.1973), this court held that mental subnormality of defendant is a factor bearing upon the issue of whether a statement or confession is voluntary. In so holding, the court said, l. c. 509: "Nor did the fact that appellant was illiterate and of subnormal mentality ipso facto render his confession inadmissible. Mental subnormality is simply one factor, although a significant one, bearing upon the question of voluntariness. 69 A.L.R.2d 348; People v. Lara (1967), 67 Cal.2d 365, 62 Cal.Rptr. 586, 432 P.2d 202, 217 [19, 20]."

■■ Also pertinent is our decision in State v. Deyo, 387 S.W.2d 561, 565 (Mo. 1965), wherein the court quoted with approval the following statement from 23 C. J.S. Criminal Law § 828, p. 228: " 'If mental incapacity of accused at the time of making the confession is shown, the confession must be received with caution, and evidence of such mental calibre or condition is competent and material, if not too remote or indefinite, as the fact thereof is to be considered in determining the character of the confession, and in determining whether it was voluntary or involuntary, and also in determining the weight, credibility, and effect to be given the confession.' "

On retrial, the rule announced in these cases should govern admission of testimony of this character, whether offered in connection with a motion to suppress and a determination thereon by the judge under the rule announced in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), or as a part of the actual trial and a submission of the issue of voluntariness to the jury pursuant to the rule stated in State v. Washington, 399 S.W.2d 109 (Mo.1966), and State v. Bridges, 491 S.W. 2d 543 (Mo.1973).[1] This will be true regardless of whether defendant has asserted a claim that he is not competent to stand trial or to cooperate with counsel.

Reversed and remanded.

All of the Judges concur.

---

1. In connection with such jury submission, attention is called to MAI–CR 3.44 and the Notes on Use for said instruction.