STATE of Missouri, Respondent,

v.

Steven C. MARTIN, Appellant.

No. WD 35940.

Missouri Court of Appeals,
Western District.

Jan. 7, 1986.

---

Michael Radosevich, Asst. Public Defender, Columbia, for appellant.

William L. Webster, Atty. Gen., Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before DIXON, J., Presiding, and SOMERVILLE and NUGENT, JJ.

DIXON, Judge.

Defendant Martin appeals from his jury conviction of forcible rape, § 566.030, RSMo 1984, and sentence to twenty-five years imprisonment. He challenges the sufficiency of the evidence, and alleges error in the trial court's failure to suppress certain statements which he claims he made without a knowing, voluntary and intelligent waiver of his rights.

Defendant first asserts the state did not prove beyond a reasonable doubt that the acts of intercourse were performed without consent and through the use of forcible compulsion. In the assessment of that claim, the court will view the evidence in the light most favorable to the State, accept all substantial evidence and all legitimate inferences fairly deducible therefrom which tend to support the verdict and reject contrary and contradictory evidence. *State v. Davis*, 497 S.W.2d 204, 207 (Mo.App. 1973).

On the evening of July 15, 1983, sixteen year old S.E., the complaining witness, attended a party at the apartment of an acquaintance. Among others at the gathering were defendant and two other men, Robinson and Lee. S.E. knew Lee as a football player from high school, and though she was not well-acquainted with defendant, she knew him to be married to a

girl she had been close friends with in junior high school. One or more of the three men asked S.E. if she had any marijuana. She did not. Later that evening, after having left the party, S.E. was sitting in a car with a female acquaintance when she again saw the three men. They asked if she had found a "joint." She said she had, and they asked her if she wanted to go riding around with them. The four drove to an area park in defendant's car where they smoked one and a half marijuana cigarettes among them.

While at the park either defendant and Lee or defendant and Robinson had a private conversation during which they discussed where they could "take" S.E. After being at the park for about twenty minutes, S.E. requested the men take her to her bicycle so she could go home. Pretending to comply, the three men got into the car, but told S.E. they first had to drop Lee off at the high school. They then drove to a gravel road in an uninhabited part of town. S.E. told defendant to stop the car, that she had to get back to her bike. Defendant replied, "We're stopping baby, we're stopping." "You've come this far you can go all the way." Lee told S.E. she "would either give it up or get out and walk." S.E., Lee, and Robinson got out of the car. S.E. started to walk away, but Lee grabbed her in a "bear hug." The two fell to the ground. S.E. began to cry. She told Lee she had trusted him and asked him how he could do this to her. She repeatedly told the three to take her to her bike. She told them they were going to get in trouble to which the men replied, "Who would believe you?" Defendant was also outside the car by this time.

S.E., still crying, told Lee she would go with him first and asked him not to hurt her. The men laughed. Lee led S.E. behind a shed at the end of the gravel road and started to pull her pants down while the other two watched. S.E. tried unsuccessfully to pull her pants back up. Lee attempted intercourse while standing, then placed S.E. on the ground and continued the intercourse. One of the other men slapped Lee's buttocks and said something

to the effect, "Hurry up, it's my turn." The men laughed. Lee got up and Robinson had intercourse with S.E. Then defendant had intercourse with S.E. Defendant finished, and Robinson had intercourse with her again, then defendant again. A car came part-way down the road during one of the episodes with Robinson. Robinson covered S.E.'s mouth and told her to "shut up."

Defendant got in his car and left. The other two men were also gone. S.E. lay on the ground about five or ten minutes, then got up to walk to a pay phone and call the police. At the end of the gravel road, she met Robinson and Lee. They had left S.E. and defendant during their last act of intercourse so in case "anything might happen" the "blame [would] be on [defendant]." Robinson told S.E. to kiss him. He told her she would "get it again if [she] didn't." Robinson told her to not "tell anyone [they had] raped [her]."

S.E. walked to a pizza parlor and used a pay telephone to call the police. She was hysterical. An officer picked her up and took her to the police station where S.E. told the police what had happened. The officer then took her to the hospital. Pictures taken at the hospital reveal that S.E. had scrapes and scratches on her back and legs. S.E. testified that she had been afraid of being hurt during the rapes.

■ The evidence is more than sufficient to support the verdict. S.E. was on a deserted gravel road with three men. The circumstances were such that the jury could infer that S.E. was afraid. S.E. testified that she feared being hurt. Consent to intercourse induced by fear is no consent. *State v. Davis*, 497 S.W.2d 204, 207 (Mo.App.1973). Utmost resistance on the part of a victim is not required when she is in fear of being hurt. *State v. Greer*, 616 S.W.2d 82, 83 (Mo.App.1981). Furthermore, a girl confronted with threatened or actual sexual abuses by a group of men is less likely to resist each member of the group, and may be so emotionally overcome by the prospect of repeated invasions

of her body that she will consent to the acts just to terminate the ordeal. *State v. Davis*, 557 S.W.2d 41, 43 (Mo.App.1977).

■ Defendant's contention that S.E.'s testimony was so inconsistent and full of discrepancy that it required corroboration is without merit. Corroboration is not necessary unless the victim's testimony is so contradictory and in conflict with physical facts, surrounding circumstances and common experience, that its validity is doubtful. *State v. Harris*, 620 S.W.2d 349, 353 (Mo. banc 1981).

■ Contrary to defendant's contentions, the record is not replete with inconsistency. Any incredulities must be considered against the backdrop of the whole situation. *Id.* at 354. S.E. was upset and afraid during the course of the five rapes. She may not have remembered every nuance of the ordeal. She admitted that she exaggerated her initial complaint to the police because she was angry. The subsequent changes she made in her story favored defendant. At any rate, the resolution of conflicts of evidence and determination of the credibility of witnesses are jury matters and it is the function of this court to determine only whether there was substantial evidence to be believed by the jury which would sustain a guilty verdict. *Id.* Furthermore, Lee's testimony amply corroborated the testimony of S.E. Defendant's first point is denied.

In his second point, defendant alleges that the trial court erred in overruling his motion to suppress certain statements made by him to the police. He claims the statements were made without a knowing, voluntary, and intelligent waiver of his rights. Defendant claims he had trouble reading and comprehending his rights and was not verbally informed of them. The statements were made the day following the rapes and consist of two written statements and two oral statements which were tape recorded and transcribed.

The first set of statements was obtained early on the morning of July 16. Sergeant Phillip Herbert went to defendant's house, searched defendant's car after having him sign a "Consent to search" form, and then asked defendant to come to the police station with him. Herbert testified that on the way to the station, he read defendant his rights from a card Herbert carries in his wallet. At the station, defendant was given a "Your Rights" form which he read and signed. The time was 6:16 a.m.

Defendant then gave an oral statement approximately thirty minutes in length which was tape recorded. The recorded interview began as follows:

PH   UNINTELLIGIBLE

SM   Yeah.

PH   That's just so I can remember everything that we said down here. Okay. This is basically the same thing, the statement of your rights that I read to you out there.

SM   UNINTELLIGIBLE killing myself.

PH   Okay, I'd like for you to read those, if you would please. Ask me, if you have any questions understanding them feel free to ask me. Do you understand that? Okay, what I need you to do is sign it right there that you do understand them. Okay, the next portion down here is a waiver; will you read that please?

SM   What questions am I gonna answer.

PH   Okay, this, this, like I, you don't have to answer any of these if you don't want to. This is gonna pertain to where you were this evening, who you were with, etcetera, uh, it pertains to what I told you about; that you were accused of rape.

SM   Whooo, God.

PH   Okay, you can stop answering any time you want to, you don't have to answer all my questions. I ask you something you don't want to answer just tell me that you don't want to answer it.

SM   By the way, after I sign this they still work or whatever. Well, well, UNINTELLIGIBLE

PH   You wanna sign this right? Okay, first of all I want you to tell me how

that cigarette thing got in the front of your car.

Defendant went on to tell Herbert that he had allowed Lee and Robinson to use his car the night before. He denied any knowledge of the rape.

After the oral statement, a written statement was prepared. Herbert testified he told defendant he had the right not to make the statement. Defendant asked Herbert to assist him in writing the statements because defendant could not spell very well. Defendant would tell Herbert two or three sentences. Herbert would ask him questions about what he meant and then condense the two or three sentences into one. Herbert said this was necessary because defendant's sentences were disjointed and out of sequence. Herbert read each sentence to defendant as he typed it. When the statement was typed, defendant read it and signed it. Herbert admitted that defendant took a long time in answering some of the questions and that he "did not really want to be answering questions." This statement also denied participation in the rape.

Defendant was taken home after he made the statements but was picked up again later that same day when a warrant was issued for his arrest. Again, defendant was given a "your rights" form which he read and signed. He then gave a second oral statement which was tape recorded and in which he admitted he and the others had had intercourse with S.E. the night before, but he claimed it was consensual. Defendant gave a second written statement to Officer Roberta Crowson. He would give Crowson a statement and she "would repeat back to him what he was trying to express" and if he agreed, she would type it. This procedure had to be followed because defendant was trying to express "too many thoughts in one sentence" for Crowson to type. Before each sentence was typed, it was repeated to defendant, and he would acknowledge if it was all right. At the end of its preparation, the statement was given to defendant. He read it and signed it.

Defendant now asserts that the "totality of the circumstances," i.e. his age of nineteen, his inexperience with the judicial system, his ingestion of alcohol and marijuana the evening before, the early hour of the first interrogation, his low intelligence or lack of education, and the "badgering" by Sergeant Herbert, including implications of leniency if he told his story, all work together to take his statements out of the realm of those made knowingly, voluntarily, and intelligently. He also claims that he asked to see his mother and was denied that privilege.

Although defendant denies it, there was evidence presented that Sergeant Herbert read defendant his rights in the car the first time defendant was taken to the police station. There is no denying that defendant signed a "your rights" form, not once, but twice. At the beginning of the first tape-recorded statement, Sergeant Herbert clearly tells defendant to read the "your rights" form and tells him it is "basically the same thing ... that I read to you out there." The defendant was told to ask questions about anything he did not understand. He was told he could stop answering any time he wanted to or refuse to answer any particular question he did not want to answer. At the beginning of the second tape-recorded statement, defendant was again instructed to read the "your rights" form and asked if having those rights in mind he was willing to talk to the police. It is clear that defendant was given his rights and given ample opportunity to refuse to answer questions.

The mental subnormality or lack of education of a defendant is only one factor to be considered when determining the voluntariness of that defendant's statements. *State v. Hyster*, 504 S.W.2d 90, 95 (Mo. 1974). At age nineteen, no matter how inexperienced defendant was with the judicial system, defendant should certainly have grasped the seriousness of the charge against him and understood the plain language of Sergeant Herbert when he spoke to him about his rights. The "your rights" form is short and uncomplicated. It was in

evidence that defendant had intentions of *renewing* his driver's license on the day of the rape. If defendant could read and answer questions on a written driving test well enough to have obtained a driver's license, it is reasonable to believe he was able to read the "your rights" form well enough to understand that he did not have to talk to the police.

Defendant claims in his brief that the ingestion of drugs and alcohol the night before were still clouding his thinking the morning of the interrogation. However, at the motion to suppress hearing, he stated he had only had a couple of beers the night before and was not feeling any effect of alcohol that morning.

Nor is his claim that Sergeant Herbert "badgered" him borne out by the record. Herbert did tell defendant that there was a "zillion types" of things he could be charged with and that without his cooperation, they would have no choice but to "push it to the max." Herbert told defendant that defendant would "feel a lot better" if he got it off his chest. These remarks relate in time to the exculpatory statement. A smattering of these sort of remarks interspersed throughout a fairly short interview in which defendant was given his rights for possibly the third time and after which defendant was allowed to go to the bathroom and offered a soda hardly amounts to a session of "badgering." Herbert's statements were not overly coercive nor did they imply a promise of leniency. In any event, the only statements made were exculpatory remarks. Defendant did not refer to these statements at the motion to suppress hearing nor did he claim that these comments by Herbert induced him to make his statement. When he was asked why he finally gave the police his statement, he said he was "forced to." He thought he would "get more time on [him]" and that Robinson and Lee were blaming everything on him. There was nothing impermissible about Herbert implying to defendant that Robinson and Lee had given statements which implicated defendant. *State v.*

*Flowers,* 592 S.W.2d 167, 169 (Mo. banc 1979).

While defendant claims he asked to see his mother and his request was refused, both Sergeant Herbert and Officer Crowson testified that defendant made no such request. The credibility of the witnesses was for the trial court to determine, *State v. Alewine,* 474 S.W.2d 848, 852 (Mo.1971), and the trial court did not abuse its discretion in rejecting the self-serving assertion of the defendant.

It is true that the burden is upon the State to show by the preponderance of the evidence that a defendant in custody was effectively advised of his rights and that he knowingly and intelligently waived them. *State v. Frazier,* 587 S.W.2d 368, 370 (Mo.App.1979). In this case, the trial court heard evidence in support of defendant's motion to suppress. The trial judge was able to observe defendant in the courtroom while he testified and was in a much better position to determine defendant's mental capacity and ability to understand and comprehend. Where evidence regarding the voluntariness of the statement is conflicting, the admissibility of the statement is in the discretion of the trial court. *Id.* The evidence presented in this case was sufficient for the trial court to find that defendant made a knowing, voluntary, and intelligent waiver of his rights.

The judgment is affirmed.

All concur.