**STATE of Missouri,
Plaintiff–Respondent,**

v.

**David MANSFIELD,
Defendant–Appellant.**

**David MANSFIELD, Movant–Appellant,**

v.

**STATE of Missouri, Respondent.**

Nos. 15934, 16444.

Missouri Court of Appeals,
Southern District,
Division One.

July 6, 1990.

Motion for Rehearing and/or Transfer to
Supreme Court Denied
July 30, 1990.

Application to Transfer Denied
Sept. 11, 1990.

Jeanene Moenckmeier, St. Louis, for defendant-appellant.

William L. Webster, Atty. Gen., Stewart M. Freilich, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

PREWITT, Judge.

Following nonjury trial defendant David Mansfield was convicted of first-degree murder and sentenced to life imprisonment without eligibility for probation or parole. After he was sentenced Mansfield filed a direct appeal (No. 15934) and a Rule 29.15 motion. His motion was denied after an evidentiary hearing. Mansfield appeals (No. 16444) from that denial. Pursuant to 29.15(*l*), the appeals have been consolidated. Mansfield presents six points relied on, the first five relating to his criminal trial. Those points are discussed in the order presented.

■ For his first point Mansfield contends that the trial court erred in finding him guilty of first-degree murder "in that no rational trier of fact could have found every essential element of first degree murder beyond a reasonable doubt." To determine if the evidence was sufficient to support the conviction, this court views the evidence and proper inferences therefrom in the light most favorable to the state. *State v. Miller*, 772 S.W.2d 782, 783 (Mo. App.1989); *State v. Cook*, 711 S.W.2d 208, 210 (Mo.App.1986).

So viewed, the evidence disclosed that the following occurred: On July 30, 1987, at approximately 11:40 p.m., Daniel Recker was lying on the floor with his fiancée in the den of his residence near Portageville. They heard an outside door leading into the den open unexpectedly, and Recker raised up on his elbows. He was killed by a shot

from a shotgun. Law enforcement investigators found an expended 20 gauge shotgun shell on a couch in the den.

On May 27, 1987, Joe Neely borrowed $9,000 from Recker which he was obligated to pay back in thirty days with interest. Neely gave this money to Mansfield to buy marijuana in Florida. With a friend Mansfield went to Florida and purchased marijuana. The marijuana was contaminated and was difficult to sell, resulting in Neely not having the money to pay Recker. Neely was able to sell some of the marijuana and with other money which he had, paid Recker $1,500 on July 19, 1987.

A few days prior to the shooting Mansfield, Neely and Robert Bell drove to Recker's house. Neely pointed out the house to Mansfield. On July 29, 1987, Mansfield discussed killing Recker with Bell. That evening Mansfield and Bell borrowed an "over and under" weapon from Bob Robinson. It had a 22 rifle barrel on top and a 20 gauge shotgun barrel below. Mansfield gave it to Bell and told him he would pay him a thousand dollars to shoot Recker.

On that day Bell drove to near Recker's house where he left the weapon and returned to Mansfield's house and told him that Recker had company. Mansfield phoned Neely and talked with him and then Mansfield and Bell drove back to near Recker's house and picked up the weapon. Bell then told Mansfield that he didn't want to kill Recker and Mansfield said that "he'd take care of it."

On the evening of July 30, 1987, the date Recker was shot, Bell and Mansfield went to a restaurant in Portageville where Neely was the manager. Mansfield talked to Neely there. Bell testified that they parted at approximately 11:00 p.m. and he went to Kennett. He said he returned to Mansfield's house about 1:30 a.m. the next day. Mansfield was there with the weapon and told Bell to take it back to Robinson.

Neely testified that the day after the shooting he saw Mansfield at Mansfield's house. Neely said that Mansfield told him that he and Bell went to Recker's house, that Mansfield went up to the door, shot Recker and then returned home with Bell.

Neely also testified that Mansfield told him that Bell did the shooting. Bell denied shooting Recker. Neely said he paid Mansfield $300 for killing Recker. Bell testified that Neely gave Mansfield more than $1000 and that Mansfield gave him $300. There was additional evidence indicating Mansfield's involvement in Recker's death, but that above set forth demonstrates that there was more than adequate evidence for the trier of fact to find that Mansfield committed or aided the commitment of the offense charged.

Mansfield argues that the credibility of the witnesses was such that the trial court could not have made its finding beyond a reasonable doubt. That credibility generally is not for this court but for the trier of fact. *State v. Martin,* 702 S.W.2d 942, 947 (Mo.App.1986); *State v. Casey,* 683 S.W.2d 282, 286 (Mo.App.1984).

"The trier of the facts, be it court or jury, and here it was the court, had leave to believe or disbelieve all, part or none of the testimony of any witness or to accept or reject in whole or in part such testimony just as a court or jury may find the same to be true or false when considered in relation to the other testimony and circumstances of the case." *Casey, supra* 683 S.W.2d at 286. Viewed by the standards above set forth there was evidence sufficient to support the conviction. The first point has no merit.

■ Mansfield's second point asserts that the trial court erred "in permitting an implied amendment of the information". This point is premised upon the trial court's finding that "Mansfield either shot Daniel Recker with the purpose to kill him or made arrangements with or contracted with Robert Bell to shoot Daniel Recker with purpose to kill him".

The information charged that "the defendant, after deliberation, knowingly killed Danny Recker by shooting him". Mansfield acknowledges that amendment of an information to include acting alone or knowingly in concert with another does not constitute an additional or different charge.

See *Fulsom v. State,* 625 S.W.2d 249, 251–252 (Mo.App.1981).

■ Even though the information charges the defendant as a principal, a trial court may properly submit to a jury active participation or aiding and abetting. *State v. Crumbaker,* 753 S.W.2d 76, 78 (Mo.App. 1988); *State v. Randleman,* 705 S.W.2d 98, 101 (Mo.App.1986). If a jury as the trier of fact can properly consider and find a defendant guilty as an accomplice based upon an information charging the defendant as a principal, then the trial judge as the trier of fact can also properly find the defendant guilty as an accomplice. The second point has no merit.

■ For his third point Mansfield contends that the trial court erred in not excluding the testimony of Joe Neely because the state did *not comply* with discovery by providing a videotape statement and informing Mansfield's counsel of an oral statement Neely made until after Neely had taken the witness stand and testified. The record does not disclose that Mansfield's attorney expressly sought to exclude any of Neely's testimony on this ground.

Neely testified as a part of the state's case. The record reflects that the following occurred during his cross-examination:

MR. BUCKLEY: [Mansfield's criminal trial counsel] Your Honor, in one of Mr. Neely's last answers to my question I understood him to say that there had been a videotape made of what he orally said when he made the statement in writing or signed on the 22nd of October at Poplar Bluff. I have not seen or even been provided a transcript of whatever was said at that videotape session, and I believe that this is something that I am entitled to by discovery.

MR. HUNTER: [Prosecuting attorney] If it please the Court, I heard him say it and it's the first knowledge that I had. As far as I know the only videotape that was taken was taken of Robert Bell, and Mr. Buckley has had access to that, and I have seen no other videotape and have had nobody tell me that there is another videotape other than Mr. Neely sayin' that. We can do some, try to do some discovery on it, but, it's of much news to me as it is to Mr. Buckley. I don't think—I really think he's mistaken.

THE COURT: Why don't you pursue it further to see whether if in fact there was a videotape taken.

MR. BUCKLEY: Well, he has made a positive statement. I think I can pursue it by calling another witness.

MR. HUNTER: Donnie Smith would know whether there was.

MR. BUCKLEY: Exactly. One of those highway patrolmen would know.

THE COURT: Would you want to call that witness now?

MR. BUCKLEY: I'd be glad to, Your Honor, because I have no reason to doubt what Mr. Neely said, saying that he was videotaped.

THE COURT: Let's let Mr. Hunter, on redirect, question him further. The Highway Patrolman, Donnie Smith, as I recall his name, is—

MR. BUCKLEY: He is the one who was in charge of making the videotape of Robert Bell.

MR. HUNTER: If he was the one, now. It could be either one or both of 'em.

THE COURT: Are they present?

MR. HUNTER: Yes, sir. If such a thing exists it's as much news to the State as it is to Mr. Buckley.

THE COURT: Of course you know what I'm thinking about, the correct procedure for handling this.

MR. HUNTER: Why don't we, Judge, take a few more minutes and let me walk out there and ask 'em if one exists just for my own personal knowledge.

THE COURT: I think that would be appropriate insofar as discovery is concerned for you to make an independent inquiry. This man's gonna be testifying anyway. Why don't you go ask him.

(Mr. Hunter left the courtroom and returned in approximately two minutes.)

MR. HUNTER: Judge, apparently that is correct. Now, they are trying to locate it. I have no idea where it is. Where do we go from here?

MR. BUCKLEY: Your Honor, I did all I could in the way of discovery and I repeatedly made requests specifically, not just what was in the Prosecutor's possession—

THE COURT: I, I know.

MR. BUCKLEY:—but what might be in the possession of other state employees.

THE COURT: I know. All right. Is there any way to obtain it?

MR. HUNTER: Well, that's what they're trying to find out now, Judge.

THE COURT: How long will it take?

MR. HUNTER: They just left to go over to the jail.

THE COURT: Let's proceed with the cross-examination of the witness.

MR. HUNTER: It's getting close to noon anyway.

THE COURT: Well, that's true. It might be appropriate to break for the noon hour because of this discovery problem. 1:00 or 1:15, what do you think?

MR. BUCKLEY: Your Honor, I don't know what's gonna happen, if they're gonna find it or not.

THE COURT: Well, I'll leave it to you. Do you wanna proceed with cross-examination for the next fifteen minutes, or do you wanna break for lunch to find out what happened to the videotape? I'll leave it to your discretion.

MR. BUCKLEY: Your Honor, I'd like to find out if it—

THE COURT: Before you proceed on?

MR. BUCKLEY:—if it is available.

THE COURT: Before you proceed?

MR. BUCKLEY: At, at a minimum.

THE COURT: I mean you, you might—I understand. I'm gonna give you an opportunity to make your record on this problem and we'll try to locate it. But, I'm simply inquiring as to whether you have some other subjects you might want to pursue.

MR. BUCKLEY: I would rather wait, Your Honor.

THE COURT: You would rather wait?

MR. BUCKLEY: Yes, sir.

THE COURT: All right. Let's do it that way. Court will be in recess until 1:15 p.m.

(Court recessed at 11:46 a.m. and resumed at 1:05 p.m. the same day, Wednesday, August 10, 1988.)

THE COURT: Are you ready?

MR. HUNTER: Yes, Your Honor. Judge, I'm handing you what's been handed to me. I want to tell you that I haven't seen it. This is the first time I've seen it. It is a Beta and nobody around here has a Beta, so it was never played in my presence nor did I know it existed, nor did any of the investigating officers, so far as I know, play it or see it. Now, the reason it was taken, so I'm told, is it was taken on the 22nd, the same day that his statement was taken, and I'm assuming it says the same thing that his statement does, but that's an assumption because I have not seen it.

THE COURT: Is there a transcript—

MR. HUNTER: No, sir.

THE COURT:—of this videotape?

MR. HUNTER: No, sir, none exists. It was taken on the 22nd because they were afraid that something would happen to Neely, and it was taken, and then when nothing happened why it was never even looked at and therefore no transcript was made.

THE COURT: Let the record show that during the noon hour I have thought about what action to take, and it occurs to me that since this is a Court-tried case, that if Mr. Buckley, because of tactical reasons regarding what he might intend to do during the remainder of the trial, should request the Court for a continuance the Court would favorably entertain that request, but, I'll leave that to Mr. Buckley.

MR. BUCKLEY: Your Honor, I need to talk to my client about it.

THE COURT: All right, sir.

MR. BUCKLEY: He has been eager all along to get the trial over with and it's been my failing in not being able to do my work faster that caused the last delay, and I hate to disappoint him by

having the thing drag on. So, let me confer with him first.

THE COURT: But I'll leave that to your discretion after discussion with your client.

MR. HUNTER: One thing further, Your Honor. We have on the way a machine that will play this tape. Nobody here has one. They have one at the Sikeston Office so it's being brought in the event Mr. Buckley wants to see what's on the tape we'll be in a position to display it for him. I have not seen it either.

THE COURT: All right, sir.

(Mr. Buckley and the Defendant left the courtroom at 1:08 p.m. and returned at 1:10 p.m. the same day, Wednesday, August 10, 1988.)

THE COURT: Let's go on the record.

MR. BUCKLEY: Your Honor, I have conferred with the Defendant and with Mr. Coleman, my co-counsel, and we elect to proceed at this time. I would ask that if the trial is not over this afternoon I be given an opportunity to see this tonight, and with the—

THE COURT: I'm sure that would be perfectly satisfactory.

MR. HUNTER: No problem.

MR. BUCKLEY:—with the possible recall of Mr. Neely tomorrow.

THE COURT: Yes.

　　*　　*　　*　　*　　*　　*

MR. BUCKLEY: Your Honor, again I am hearing something for the first time from this witness, I understood him to just say that he has told the Prosecutor, Mr. Hunter, and the Sheriff, Mr. Rone, some time previous, that he had paid David Mansfield $300.00. This has never been disclosed to me, and I believe the Court might see fit to disregard this on the basis that there was no discovery furnished the Defendant, if what he says is true, that he did tell the Prosecutor and the Sheriff.

THE COURT: I'll take into consideration your objection and determine in my own mind its value both legally and factually.

MR. HUNTER: Your Honor, of course that statement was made as an oral statement and we're not bound to give him any oral statement we have received. Secondly, this information was available to Mr. Buckley and has been from the start in Robert Bell's statement which he has a copy of.

■ As earlier noted, there was no express request for the relief which Mansfield now asserts. A litigant may not rely upon a theory which is different than the one offered at trial. *State v. Clark*, 759 S.W.2d 372, 374 (Mo.App.1988). In addition the trial court gave Mansfield's counsel an opportunity for a continuance or for time to view the video tape and counsel made no request for further time to investigate either the video tape or the statement regarding the payment of money. Assuming that there was a violation of the discovery rules by the state, a finding we do not make, the remedy for such a violation is within the sound discretion of the trial court. *State v. Kilgore*, 771 S.W.2d 57, 66 (Mo. banc), cert. denied, — U.S. —, 110 S.Ct. 211, 107 L.Ed.2d 164 (1989). Determining the proper sanction is an abuse of discretion only where admission of the evidence results in fundamental unfairness to the defendant. *Id.* Fundamental fairness is measured by whether the evidence or the discovery of it would have affected the outcome of the trial. *Id.* The record does not indicate that fundamental unfairness to Mansfield occurred. This point is denied.

■ Mansfield contends in his fourth point that the trial court "committed plain error in failing to exercise its discretion to impose sanctions against the state for failing to disclose the deals made with Robert Bell in exchange for his testimony in the case against David Mansfield." At trial and here respondent denies that there was any "deal" with Bell. Bell also denied any such deal or understanding. Mansfield's contention is that certain circumstances show that such a deal was made. These are stated in his brief (omitting page citations):

It is obvious from the record, that the State intentionally suppressed and failed

to disclose the following deal made to Robert Bell: That if he would testify on behalf of the State in the trial of David Mansfield that the following pending charges would be dismissed: First Degree Murder in the murder of Daniel Recker, possession of a concealed weapon, burglaries and other charges, and, that if he testified favorably that that would affect the pending probation revocation which was postponed for over a year until the trial was over.... Although he was locked up in jail from November 1987 to January 25, 1988 he never saw an attorney nor asked for one. Bell stated that he didn't feel he needed an attorney. He stated "No, Sir. I thought, I thought I had it pretty much under control myself." Obviously, that implied that he was being protected by the prosecutor from prosecution for the pending charges in some manner and that his probation would not be revoked.

Although certain circumstances may indicate that such a deal was possible, as there is nothing which conclusively establishes that a deal was made, the trial court did not err in denying any sanctions. Cf. *State v. Holt*, 659 S.W.2d 233, 235–236 (Mo.App. 1983). Point four is denied.

■ For his fifth point Mansfield contends that it "was plain error for the court to permit the testimony of the state's witnesses Robert Bell and Joe Neely and thereafter to convict appellant based on their testimony after it became aware of the false testimony given by the witness." Mansfield contends that the trial court had "an affirmative duty to acquit appellant or grant him a new trial. Failure to acquit or grant a new trial was a violation of appellant's right to due process and a fair trial and to confront and cross-examine witnesses as guaranteed by the fifth, sixth and fourteenth amendments to the United States Constitution and Article I, Sections 10 and 18(a) of the Missouri Constitution."

■ Although there were certain inconsistencies in their testimony, that alone does not establish perjury by either witness. Inconsistent statements do not prove perjury. *State v. Reasonover*, 714 S.W.2d

706, 714 (Mo.App.1986), cert. denied, 480 U.S. 936, 107 S.Ct. 1580, 94 L.Ed.2d 771 (1987). In order to get relief a criminal defendant must establish that the testimony was deliberately falsified, known by the prosecutor to be false and that the conviction was obtained as a result of such testimony. *Id.* No such showing is present. This point is denied.

■ Mansfield's remaining point challenges the trial court's findings denying his Rule 29.15 motion. That point states that appellant's trial attorney in the criminal case "failed to exhibit the customary skill and diligence exercised by a reasonably competent attorney under similar circumstances" in twelve particulars. Mansfield contends in that point that "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceedings would have been different" and that he "was denied his right to effective assistance of counsel".

"To sustain a claim of ineffective assistance of counsel movant must establish that there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different; a reasonable probability being a probability sufficient to undermine confidence in the outcome". *Tatum v. State*, 693 S.W.2d 903, 904 (Mo.App.1985).

Appellate review of the trial court's determination on Mansfield's Rule 29.15 motion is "limited to a determination of whether the findings and conclusions of the trial court are clearly erroneous." Rule 29.15(j). Under that standard the denial of the motion must be affirmed.

Movant did not meet his burden of establishing that his trial counsel did not use the customary skill and diligence exercised by a reasonably competent attorney under similar circumstances. See *Tate v. State*, 675 S.W.2d 89, 90–91 (Mo.App.1984).

The trial judge hearing Mansfield's motion made fifteen pages of what appears to be carefully considered findings of fact and entered judgment denying the motion. An examination of the record regarding the motion and the record on Mansfield's crimi-

nal trial reveals that those findings are not clearly erroneous. Those records also reflect that movant's counsel was not ineffective in the particulars claimed and even if he had proceeded as Mansfield now says he should, there is no reasonable likelihood that the result would have been different. Movant's complaints are either without basis in fact or were trial strategy for which his counsel cannot be faulted and Mansfield was not prejudiced. The sixth point is denied.

The judgments are affirmed.

CROW, P.J., and PARRISH, J., concur.